# EXHIBIT A

LEXSEE

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, v. MCIN-
TYRE GROUP, LTD., Defendant.**

**Civil Action No. 07 CV 5458**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

**2007 U.S. Dist. LEXIS 90847; 90 Empl. Prac. Dec. (CCH) P43,054**

**December 11, 2007, Decided
December 11, 2007, Filed**

**CORE TERMS:** citation omitted, charging party, re-
taliation, harassment, unlawful acts, employment prac-
tices, class member, failure to state a claim, entitled to
relief, retaliating, heightened, subjecting, workplace',
notice, Civil Rights Act, employment discrimination,
adversely affected, fair notice, different terms, conditions
of employment, turned down, perpetrated, oft-quoted,
plausibly, clarified, retooled, engaging, withhold, sur-
vive, pleader

**COUNSEL:** [*1] For Equal Employment Opportunity
Commission, Plaintiff: Aaron R. DeCamp, LEAD AT-
TORNEY, Equal Employment Opportunity Commission,
Chicago, IL; Diane Ilene Smason, John C. Hendrickson,
United States Equal Employment Opportunity Commis-
sion, Chicago, IL.

For Mcintyre Group, LTD, Defendant: Anne Elizabeth
Duprey, LEAD ATTORNEY, John W. Powers, LEAD
ATTORNEY, Seyfarth Shaw LLP, Chicago, IL.

**JUDGES:** George W. Lindberg, Senior United States
District Judge.

**OPINION BY:** George W. Lindberg

**OPINION**

**MEMORANDUM AND ORDER**

On September 27, 2007, Plaintiff Equal Employ-
ment Opportunity Commission (the "EEOC") filed a
complaint against Defendant McIntyre Group, Ltd.
("McIntyre") pursuant to Title VII of the Civil Rights
Act of 1964 and Title I of the Civil Rights Act of 1991.
The complaint was filed "to correct unlawful employ-
ment practices on the basis of race and. . .provide appro-

priate relief to Charging Party Mark Hedgeman
[("Hedgeman")] and various classes of employees who
were adversely affected by such practices." It also alleges
claims for "retaliation against Hedgeman and various
classes of employees who were adversely affected by
such practices." McIntyre moved to dismiss the EEOC's
complaint pursuant to Federal Rules of Civil Procedure 8
[*2] and 12(b)(6) on October 18, 2007. McIntyre's mo-
tion is denied.

*Legal Standard -- Rule 12(b)(6) Motions*

Rule 12(b)(6) permits motions to dismiss a com-
plaint for "failure to state a claim upon which relief can
be granted. . . ." FED. R. CIV. P. 12(b)(6). To survive a
Rule 12(b)(6) motion, "the complaint need only contain a
'short and plain statement of the claim showing that the
pleader is entitled to relief.'" *Equal Employment Oppor-
tunity Comm'n v. Concentra Health Servs., Inc.,* 496 F.3d
773, 776 (7th Cir. 2007) (citation omitted). This re-
quirement

> impose[s] two easy-to-clear hurdles.
> First, the complaint must describe the
> claim in sufficient detail to give the de-
> fendant 'fair notice of what the. . .claim is
> and the grounds upon which it rests.'. .
> .Second, its allegations must plausibly
> suggest that the plaintiff has a right to re-
> lief, raising that possibility above a
> 'speculative level;' if they do not, the
> plaintiff pleads itself out of court.

*Id.* (citations omitted); *see also Killingsworth v. HSBC
Bank Nev., N.A.,* No. 06-1616, 2007 U.S. App. LEXIS
26124, 2007 WL 3307084, at *3 (7th Cir. Nov. 9, 2007)

2007 U.S. Dist. LEXIS 90847, *; 90 Empl. Prac. Dec. (CCH) P43,054

("The [Supreme Court] explained in *Bell Atlantic* that the 'plaintiff's obligation to provide the 'grounds' of his [*3] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'. . .Although this does 'not require heightened fact pleading of specifics,' it does require the complaint to contain 'enough facts to state a claim to relief that is plausible on its face.'") (citations omitted). When determining whether the EEOC has cleared these hurdles, the Court "accept[s] the complaint's well-pleaded allegations as true and draw[s] all favorable inferences for [the EEOC]." *Killingsworth*, No. 06-1616, 2007 U.S. App. LEXIS 26124, 2007 WL 3307084, at *2 (citation omitted).

As an initial matter, the EEOC takes issue with McIntyre's interpretation of the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). McIntyre's motion provides that "the Supreme Court clarified and redefined" the notice pleading standard stated in Rule 8(a)(2). *See* FED. R. CIV. P. 8(a)(2) ("A pleading which sets forth a claim for relief. . .shall contain. . .a short and plain statement of the claim showing that the pleader is entitled to relief. . . .). The EEOC disputes McIntyre's reading of *Bell Atlantic*. Specifically, the EEOC argues that the Supreme [*4] Court's decision did not "overhaul[] the notice pleading standard" or impose "a heightened fact pleading standard" in employment discrimination cases; rather, it "merely updated the oft-quoted language in *Conley v. Gibson*. . .that 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). The Court agrees with McIntyre that *Bell Atlantic* retooled federal pleading standards. *See* *Killingsworth*, No. 06-1616, 2007 U.S. App. LEXIS 26124, 2007 WL 3307084, at *2 ("In *Bell Atlantic*, the Supreme Court retooled federal pleading standards, retiring the oft-quoted *Conley* formulation that 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (citations omitted). That noted, the Court also agrees that *Bell Atlantic* does not require the Court to apply a heightened pleading standard to complaints alleging employment discrimination. *See* 2007 U.S. App. LEXIS 26124, [WL] at *3; *see also* *Erickson v. Pardus*, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007); *Bell Atlantic*, 127 S. Ct. at 1974; [*5] *Concentra Health Servs., Inc.*, 496 F.3d at 782.

*Analysis*

In support of its motion, McIntyre argues that the "claims asserted by [the] EEOC. . .do not meet the federal pleading standard." Specifically, McIntyre contends that the complaint "is patently deficient. . .because it contains not a single factual allegation in support of [the] EEOC's claims of class-wide discrimination and retaliation." McIntyre adds that the "EEOC offers no facts whatsoever to support its broad class claims (or to support its claims that Hedgeman was individually subjected to discrimination and harassment, which are essentially intermingled with the class claims)." Finally, McIntyre suggests that because the EEOC's complaint "does not contain any factual allegations from which the identity of a single class member is apparent or may be discerned[,]. . .McIntyre cannot conceivably be on notice as to the claims against it or the grounds therefor."

Paragraph 7 of the EEOC's complaint provides, in part:

> Since at least 2004, [McIntyre] has engaged in unlawful employment practices at its facility in University Park, Illinois, in violation of. . .Title VII. . . .These unlawful employment practices. . .include, but are not [*6] limited to, the following:
>
> (a) discriminating against Hedgeman and a class of employees by subjecting them to harassment because of their race, African American;
>
> (b) subjecting a class of African American employees to different terms and conditions of employment by paying them less than similarly situated non-African American employees;
>
> (c) subjecting a class of African American employees to different terms and conditions of employment by failing to promote qualified African-American employees;
>
> (d) retaliating against [Hedgeman] by failing to promote him because he complained to [McIntyre] about race harassment

Case 1:07-cv-06996   Document 15-2   Filed 02/07/2008   Page 4 of 38

2007 U.S. Dist. LEXIS 90847, *; 90 Empl. Prac. Dec. (CCH) P43,054

and/or discrimination in the workplace;

(e) retaliating against [Hedgeman] and a class of employees by terminating them because they complained to [McIntyre] about race harassment and/or discrimination in the workplace; [and]

(f) retaliating against a class of employees by engaging in conduct (withholding []or threatening to withhold[] employee bonuses because a charge of discrimination was filed with [the] EEOC) that intimidated, or had the effect of intimidating, employees from and created disincentives for engaging in protective [sic] activity.

(Compl., at P7.) After reviewing the [*7] allegations included in paragraph 7, the Court concludes that they provide McIntyre with fair notice of the EEOC's claims and the grounds upon which they rest. *See Concentra Health Servs., Inc.*, 496 F.3d at 781-82 ("[A] plaintiff alleging employment discrimination on the basis of race, sex[,] or some other factor governed by 42 U.S.C. § 2000e-2 may allege the defendant's intent quite generally: "I was turned down for a job because of my race' is all a complaint has to say.'. . .People have reasonably clear ideas of how a racially biased person might behave, and a defendant responding to an allegation of racial bias can anticipate the sort of evidence that may be brought to bear and can investigate the claim. . . .[O]nce a plaintiff alleging illegal discrimination has clarified that it is on the basis of her race, there is no further information that is both easy to provide and of clear critical importance to the claim.") (citations omitted) [1]; *see also Erickson*, 127 S. Ct. at 2200 ("[s]pecific facts are not necessary") (citations omitted); *Killingsworth*, No. 06-1616, 2007 U.S. App. LEXIS 26124, 2007 WL 3307084, at *3. And when taken as true (*see Killingsworth*, No. 06-1616, 2007 U.S. App. LEXIS 26124, 2007 WL 3307084, at *2), the Court [*8] finds that the allegations plausibly suggest that the EEOC is entitled to relief. *See Concentra Health Servs., Inc.*, 496 F.3d at 776.

1 *Concentra Health Servs., Inc.* may be factually distinguished from the instant case. In *Concentra Health Servs., Inc.*, the Seventh Circuit affirmed the dismissal of a retaliation complaint that did not "specify the 'conduct in the workplace'" reported by the charging party. 496 F.3d at 781. Specifically, the amended complaint did "not specify the nature of the conduct [that the charging party] reported to [the defendant] other than to indicate that [the charging party] reasonably believed that it violated Title VII." *Id. at 776*. In affirming the district court's dismissal, the Seventh Circuit noted that "[p]recedent confirms that a plaintiff like the EEOC alleging illegal retaliation on account of protected conduct must provide some specific description of that conduct beyond the mere fact that it is protected." *Id. at 781*. The Seventh Circuit therefore found that the "proper analogue for the [amended] complaint [wa]s not a complaint alleging racial discrimination in hiring; it [wa]s a complaint in which the plaintiff withholds the basis upon which she [*9] suspects her employer acted: 'I was turned down for a job for a reason forbidden by Title VII.' To permit the EEOC's complaint would reward obfuscation, a perverse result." *Id. at 782*.

With respect to McIntyre's argument that the EEOC's failure to identify class members mandates dismissal under Rule 12(b)(6), the Court notes that McIntyre cites to no authority to support its position. Specifically, the citation to *Bell Atlantic* provided by McIntyre does not suggest that the EEOC must identify class members to survive a Rule 12(b)(6) motion. *See Bell Atlantic*, 127 S. Ct. at 1964-65. Moreover, paragraph 7 provides (1) the relevant time period during which the alleged unlawful acts occurred, (2) the specific facility at which they allegedly occurred, (3) the race of the employees against which the alleged unlawful acts were perpetrated, (4) specific unlawful acts that were allegedly perpetrated, and (5) specific protected activities under Title VII that McIntyre allegedly acted to thwart. The Court therefore concludes that McIntyre's argument lacks merit. *See Erickson*, 127 S. Ct. at 2200; *Killingsworth*, No. 06-1616, 2007 U.S. App. LEXIS 26124, 2007 WL 3307084, at *3; *Concentra Health Servs., Inc.*, 496 F.3d at 776.

**ORDERED:** [*10] McIntyre's Motion to Dismiss the Complaint [8] is denied. McIntyre is ordered to answer the EEOC's complaint on or before December 21, 2007.

**DATED:** December 11, 2007

/s/ George W Lindberg

George W. Lindberg

2007 U.S. Dist. LEXIS 90847, *; 90 Empl. Prac. Dec. (CCH) P43,054

Senior United States District Judge

LEXSEE

**DARRYL CARTER, Plaintiff, v. ILLINOIS DEPARTMENT OF CORRECTIONS and CHUCK GOBBLE, Defendant.**

**Case No. 02 C 5676**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2004 U.S. Dist. LEXIS 23681**

**September 24, 2004, Decided**

**DISPOSITION:**    Defendants' motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, an African-American employee, sued defendants, his employer and his Caucasian supervisor, under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq, and the Civil Rights Act of 1866, 42 U.S.C.S. § 1981, alleging that he was discriminated against on the basis of race. Specifically, the employee alleged that his supervisor subjected him to a racially hostile work environment. Defendants moved for summary judgment.

**OVERVIEW:** Despite alleging that he was subject to harassment on a daily basis, the employee pointed to only three specific incidents in support of his racial harassment claim: (1) the supervisor's January 2, 2002, radio transmission; (2) the supervisor's assignment of shower duties to the employee's shift on March 5, 2002; and (3) the supervisor's allegedly overbearing supervision of the employee's performance. However, the employee did not point to any facts indicating that the incidents in question were discriminatory in nature. The supervisor's tone of voice during the radio incident may have been disrespectful or unprofessional, but the employee's conclusion that it was a race-based incident was unsupported. Similarly, the employee did not point to facts that would allow a reasonable juror to conclude that the supervisor's one-day assignment of shower duties to the employee's shift was a discriminatory act. Even if the employee had proved that there was a racial element to the supervisor's conduct, the incidents were too isolated and tepid to constitute actionable racial harassment under Title VII. In the absence of additional proof, the employee's hostile work environment claim failed.

**OUTCOME:** Defendants' motion for summary judgment was granted.

**CORE TERMS:** harassment, undisputed, summary judgment, racially, hostile, work environment, correctional officer, discriminatory, shower, warden, inmate, staff, radio, genuine issue, superintendent, supervisor, actionable, pervasive, severe, disrespectful, supervisory, demeaning, surprise, prisoner, rank, Civil Rights Act, matter of law, discriminatory conduct, party opposing, unreasonably

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1]Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. The party opposing summary judgment may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. There is no genuine is-

sue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.

*Labor & Employment Law > Affirmative Action > General Overview*
*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Severe & Pervasive Standards*
*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment*

[HN2]To prevail on a claim that he was subjected to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C.S. § 1981, the plaintiff must show, inter alia, that: (1) he was subject to unwelcome harassment based on his race, and (2) the harassment was severe and pervasive enough to alter the conditions of his employment and create a working environment that was objectively and subjectively hostile.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN3]In evaluating a hostile work environment claim on summary judgment, the court must consider myriad factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Title VII of the Civil Rights Act of 1964 is not a general civility code, and it is not intended to remedy complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive language. Rather, harassment must be racially discriminatory in character or purpose to be actionable under Title VII.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN4]Unsupported conclusions by other employees of an atmosphere of bias are insufficient to support a Title VII of the Civil Rights Act of 1964 claim absent specific allegations of discriminatory or harassing conduct directed at the plaintiff.

**COUNSEL:** [*1]  For DARRYL CARTER, plaintiff: Armand L. Andry, Law Offices of Armand L. Andry, Oak Park, IL.

For ILLINOIS DEPARTMENT OF CORRECTIONS, defendant: Deborah Joyce Allen, Illinois Attorney General's Office, Chicago, IL. Victoria D Bousis, Office of the Illinois Attorney General, Chicago, IL.

For CHUCK GOBBLE, defendant: Deborah Joyce Allen, Illinois Attorney General's Office, Chicago, IL. Victoria D Bousis, Office of the Illinois Attorney General, Chicago, IL.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Judge Joan B. Gottschall

Plaintiff Darryl Carter has sued his employer, the Illinois Department of Corrections (the "IDOC"), and his supervisor, Superintendent Chuck Gobble, under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and the Civil Rights Act of 1866, 42 U.S.C. § 1981, alleging that he was discriminated against on the basis of race. Specifically, Carter alleges that Gobble, who is white, subjected him to a racially hostile work environment. Defendants have moved for summary judgment, arguing that the undisputed facts establish as [*2] a matter of law that (1) the alleged harassment was not severe or pervasive enough to be actionable, (2) Gobble's actions were not racially motivated, and (3) the IDOC cannot be held liable for Gobble's actions because it provided an effective mechanism to prevent and correct discrimination and Carter unreasonably failed to take advantage of the IDOC's remedial mechanism. For the reasons stated below, defendants' motion for summary judgment is granted.

**BACKGROUND**

Carter, who is African-American, is a correctional officer at the IDOC's Stateville Correctional Center ("Stateville") in Joliet, Illinois. In March of 1991, Carter was promoted to his current rank of lieutenant. In that position Carter is responsible for the safety and sanitation of his unit, addressing inmate issues, supervising inmate movements, running inmate showers, ensuring inmate compliance with property rules, reporting unusual incidents, supervising lower-ranked officers, and carrying out orders given to him by superior officers.

Carter alleges that he became the target of racial harassment once Chuck Gobble became his supervisor. Gobble was promoted to the rank of superintendent and

transferred to Stateville [*3] around August 2001. As part of his duties, Gobble supervised two shifts that patrolled Stateville's "B and C Houses" -- Carter's shift, which worked from 7:00 a.m. to 3:00 p.m., and a later shift that worked from 3:00 p.m. to 11:00 p.m. Both shifts included African-American correctional officers and supervisory staff. All of the supervisory officers for Carter's shift were African-American. Although Carter sometimes refers to the 3-11 shift as the "all white" shift, it is undisputed that the supervisory staff of the 3-11 shift included two white officers, one Asian-American officer and one African-American officer. [1]

> 1  It is undisputed that the non-supervisory staff of both shifts included African-American correctional officers. However, neither Gobble nor Carter provide evidence of the precise racial makeup of the two shifts. Overall, as of January 31, 2002, the vast majority of correctional officers at Stateville, at both higher and lower ranks, were African-American.

Carter alleges that Gobble was disrespectful [*4] and demeaning to Carter and other African-American staff members. He alleges that he was "disrespected" on an almost daily basis and that nothing changed after Carter confronted Gobbles about the disrespectful treatment, nor after he complained to the IDOC's Affirmative Action Officer. [2] Carter requested a transfer from Gobble's supervision, but Stateville's warden, Ken Briley, refused Carter's request.

> 2  The IDOC's Affirmative Action Office Administrator is responsible for an IDOC antidiscrimination program. This administrator is responsible for educating staff about antidiscrimination policies and for taking complaints of discrimination and harassment. The IDOC posts in each facility an EEOC poster and a copy of the IDOC Affirmative Action Policy Statement that sets forth reporting procedures for discrimination and harassment. It is undisputed that the IDOC also provides each employee with a copy of this policy.

Although Carter alleges that he was repeatedly harassed, he points to only three specific incidents [*5] in support of his claims of racial harassment:

First, Carter claims that on January 2, 2002, Gobble used a demeaning tone of voice when issuing a command over the radio directed to Carter and another officer in Carter's shift. That incident arose out of Warden Briley's January 1, 2002 surprise search of the cells in B and C Houses. Briley conducted the search to root out any violations of Stateville's rules regarding prisoners' personal property. The Warden discovered property violations in

both houses and informed Gobble of the deficiency. Apparently seeking an immediate correction, Warden Briley conducted a second surprise compliance check the next day, January 2. When Gobble learned of Briley's second compliance check, he radioed Carter and another officer on duty to notify them. In that radio transmission Gobble warned Carter and another officer that "there better not be any issues and I'm not going to take this for a second day in a row." Carter took offense at Gobble's warning and, on January 3, 2002, filed a written complaint alleging that Gobble's behavior was discriminatory. Carter had not previously lodged any complaints of discriminatory conduct by Gobble. In a January 11, 2002, response [*6] to Carter's incident report, the IDOC Affirmative Action Office found that Gobble's radio message did not violate the IDOC's anti-discrimination policies.

Second, Carter claims that, on March 5, 2002, his shift was required to perform duties that should have been performed by the "all white" 3-11 shift. While the job descriptions of each shift require running prisoner showers and conducting prisoner shakedowns, traditionally Carter's shift performed the shakedowns, while the evening shift supervised the showers. On March 5, 2002, however, Gobble ordered Carter's shift to perform both tasks. Carter felt that those additional duties were given to his shift because the 3-11 shift was "all white." Carter filed a complaint in response to this incident on March 6. In a memorandum dated March 15, 2002, Warden Briley concluded that Carter's allegation of bias was without support.

Third, Carter claims that Gobble monitored his activities too closely and "stood over his shoulder" to make sure that tasks were completed. The only specific example cited by Carter is that in March of 2002, Gobble instructed Carter to make phone calls to obtain information regarding a hospitalized inmate. [*7] After doing so, Carter was instructed by Gobble to call for the information again. Carter alleges that the second call was clearly unnecessary and, therefore, harassment. As for other incidents of ongoing demeaning comments and unequal treatment, Carter provides no specifics except to say that he was spoken to "like a child" and that, when he was given assignments by Gobble, "within minutes" Gobble would "be standing over him" to see that the task was completed.

It is undisputed that Gobble was a hands-on manager: Gobble followed up with all officers regardless of their race or gender to confirm that tasks were completed. It is also undisputed that Gobble has never used a racial slur or other racially derogatory language in Carter's presence. Since the events alleged in the complaint, Carter has not had his pay or benefits reduced, and has not been transferred, demoted, suspended or dis-

ciplined. His duties and responsibilities have not changed during that period.

## ANALYSIS

[HN1]Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material [*8] fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. See Griffin v. Thomas, 929 F.2d 1210, 1212 (7th Cir. 1991). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Id.

Carter claims that he was subjected to a racially hostile work environment in violation of Title VII and Section 1981. [HN2]To prevail on that claim, Carter must show, inter alia, that: 1) he was subject to unwelcome harassment based on his race, and (2) the harassment was severe and pervasive enough to alter the conditions of his employment and create a working environment that was objectively [*9] and subjectively hostile. Mason v. Southern Ill. Univ. at Carbondale, 233 F.3d 1036, 1043 (7th Cir. 2000). Carter's hostile work environment claim falls short on both of those elements.

[HN3]In evaluating a hostile work environment claim on summary judgment, the court must consider myriad factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). Title VII is not a "general civility code," and it is not intended to remedy complaints attacking "the ordinary tribulations of the workplace, such as sporadic use of abusive language. . . ." Faragher v. City of Boca Raton, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998); see also Patton v. Indianapolis Public Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002) ("many employees have to put up with some amount of rude, arrogant or boorish behavior at work . . . Title VII does not guarantee a Utopian workplace, or even a pleasant one"). Rather, [*10] harassment must be racially discriminatory in character or purpose to be actionable under Title

VII. Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340 at 345.

Despite alleging that he was subject to harassment on a daily basis, Carter points to only three specific incidents in support of his racial harassment claim: (1) Gobble's January 2, 2002 radio transmission, (2) Gobble's assignment of shower duties to Carter's shift on March 5, 2002, and (3) Gobble's allegedly overbearing supervision of Carter's performance. [3]

> 3  Carter attempts to supplement those three incidents of harassment by pointing to other, mostly unrelated, complaints of racial harassment lodged by other IDOC correctional officers. However, the relationship of those complaints to Carter's claim is tenuous. Most of the complaints by other officers did not involve Superintendent Gobble and some of the misconduct alleged in those complaints did not take place at Stateville. In all events, Carter does not point to any facts reflecting that he was the target of those alleged acts of harassment, that he witnessed those incidents or that he even knew of those incidents during the time period at issue. Although potentially relevant on other issues, such evidence is not relevant to the question whether Carter suffered severe and pervasive harassment. See Johnson v. City of Fort Wayne, Indiana, 91 F.3d 922, 938 (7th Cir. 1996) (holding that [HN4]"unsupported conclusions" by other employees of an "atmosphere of bias" are insufficient to support a Title VII claim "absent specific allegations of discriminatory or harassing conduct directed at [plaintiff]") (emphasis added).

[*11]  However, Carter does not point to any facts indicating that the three incidents in question were discriminatory in nature. While Carter need not prove that Gobble's actions were explicitly racist, Carter must, at least, show that Gobble's actions were discriminatory in purpose. Carter has not pointed to any facts that could allow him to fulfill that burden. Gobble's tone of voice in the January 2, 2002 radio incident may have been disrespectful or unprofessional. However, Carter's conclusion that this was a race-based incident is unsupported: the undisputed evidence confirms that Gobble issued his order because of the previous day's deficient performance during Warden Briley's surprise compliance check. Similarly, Carter has not pointed to any facts that would allow a reasonable juror to conclude that Gobble's one-day assignment of shower duties to Carter's shift was a discriminatory act. Although it may have been uncommon for Carter's shift to perform shower duty, it is undisputed that such duties fall within Carter's job description. Moreover, there is no evidence that the allocation of

2004 U.S. Dist. LEXIS 23681, *

duties between shifts was racially motivated: the undisputed evidence reflects that both shifts [*12] included non-white correctional officers and non-white supervisors.

Even if Carter could prove that there was a racial element to Gobble's conduct, these three incidents are too isolated and tepid to constitute actionable racial harassment under Title VII. Absent evidence of further specific acts of discrimination directed at Carter, Carter's hostile work environment claim must fail.

Because no reasonable jury could conclude that Carter suffered a racially hostile work environment under Title VII, defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.

ENTER:

JOAN B. GOTTSCHALL

United States District Judge

DATED: September 24, 2004

LEXSEE



Positive
As of: Feb 06, 2008

**DOROTHY TURNER, Plaintiff, v. MICRO SWITCH, a division of HONEYWELL, INC., Defendant.**

No. 98 C 50276

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

2001 U.S. Dist. LEXIS 63; 80 Empl. Prac. Dec. (CCH) P40,514

**January 3, 2001, Decided**
**January 3, 2001, Filed**

**NOTICE:** [*1] NOT FOR PUBLICATION

**DISPOSITION:** Micro Switch's Rule 56 motion granted, its motion to strike denied, and its request for oral argument denied. Turner's motion to strike granted. Cause dismissed in its entirety.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant moved for summary judgment in plaintiff's case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.

**OVERVIEW:** Plaintiff worked for defendant manufacturer as a group leader. When defendant abolished plaintiff's position, it created a technical associate position that required many group leader skills as well a higher level of technical expertise. Although previous group leaders were given the first opportunity to fill the new technical associate positions, plaintiff was not one of those selected, because another person had seniority. Plaintiff sued, claiming that she was denied promotions because of her race, that she was subjected to a racially hostile work environment, and that she suffered employment retaliation after she filed an Equal Employment Opportunity claim. The court held that, while plaintiff did establish a prima facie case of unlawful discrimination, defendant's articulated reason for not promoting plaintiff was non-pretextual. Plaintiff failed to bring forth evidence showing discrimination or harassment to support her allegations of a racially hostile work environment. Plaintiff's claim of a cold and unfriendly atmosphere and failure to greet her were trivial matters that did not rise to the level of actionable retaliation.

**OUTCOME:** The court granted defendant's summary judgment motion because defendant's articulated reason for not promoting plaintiff was non-pretextual, plaintiff failed to show evidence of a hostile work environment, and a cold, unfriendly atmosphere and failure to greet plaintiff was not actionable retaliation.

**CORE TERMS:** promotion, harassment, coworker, supervisor, work environment, hostile, retaliation, racial slurs, nigger, seniority, summary judgment, candidates, subjected, prima facie case, qualifications, racially, hiring, deposition, unfriendly, promoted, falsely, moving party, conclusory allegations, discrimination claim, race discrimination, direct evidence, protected activity, self-serving, factfinder, actionable

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*

Case 1:07-cv-06996     Document 15-2     Filed 02/07/2008     Page 14 of 38

2001 U.S. Dist. LEXIS 63, *; 80 Empl. Prac. Dec. (CCH) P40,514

[HN1]Under U.S. Dist. Ct., N.D. Ill., R. 56.1(a), the moving party may controvert additional material facts submitted by the opposing party pursuant to U.S. Dist. Ct., N.D. Ill., R. 56.1(b). However, its denials must be based on materials already part of the record unless the opposing party's Rule 56.1(b) statement of additional facts raises unanticipated new issues entirely outside the scope of the moving party's motion for summary judgment.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2]Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The question to be determined is whether, if the record of the summary judgment proceeding were the record at trial, a reasonable fact finder could find in favor of the non-moving party. The record is to be examined in the light most favorable to the non-movant, but conclusory allegations will not suffice. Intent and credibility are crucial issues in employment discrimination cases and, therefore, the summary judgment standard is applied with added rigor in such cases, but summary judgment will not be defeated just because motive or intent are involved.

*Civil Rights Law > Practice & Procedure > Continuing Violations*
*Governments > Legislation > Statutes of Limitations > Extension & Revival*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations > Continuing Violations*
[HN3]Under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000 e et seq., a charging party must file a charge with the Equal Employment Opportunity Commission within 300 days after the allegedly unlawful employment practice occurred. 42 U.S.C.S. § 2000e-5(e)(1).

*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN4]Under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000 e et seq., it is unlawful for an employer to decide not to promote an employee because of her race. 42 U.S.C.S. § 2000e-2(a)(1). The two accepted ways of establishing that an employer has discriminated are by direct evidence (taking the form of, "I did not promote you because of your race"), or by indirect evidence.

*Labor & Employment Law > Discrimination > Disparate Treatment > General Overview*
[HN5]Under the indirect, burden-shifting method, a plaintiff must initially establish a prima facie case of unlawful discrimination by demonstrating: (1) she is in a protected class; (2) she was qualified for the promotion; (3) she did not receive the promotion despite her qualifications; and, (4) a person not in the protected class was promoted instead. The burden then shifts to defendant, which must articulate a legitimate, non-discriminatory reason for why plaintiff was not promoted. The burden then shifts back to the plaintiff to produce evidence from which a reasonable factfinder could conclude defendant's articulated reason is pretextual, meaning it is a lie or completely lacks a factual basis.

*Labor & Employment Law > Discrimination > Disparate Treatment > General Overview*
[HN6]It is well-established that a plaintiff's own self-serving statements about her qualifications is insufficient to carry the day. An employee's self-serving statements about her ability do not establish pretext. A plaintiff's own opinions about his performance or qualifications do not give rise to a material factual dispute.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
*Evidence > Hearsay > Rule Components > Statements*
[HN7]The court does not consider hearsay statements that are otherwise inadmissible at trial at the summary judgment stage.

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Employment Practices > Compensation*
*Labor & Employment Law > Discrimination > Racial Discrimination > Employment Practices > Compensation*
*Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Circumstantial & Direct Evidence*
[HN8]A plaintiff with a wage discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., must meet demanding standard of persuading factfinder employer intended to discriminate.

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 15 of 38

2001 U.S. Dist. LEXIS 63, *; 80 Empl. Prac. Dec. (CCH) P40,514

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Employee Burdens*

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Severe & Pervasive Standards*

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment*

[HN9]An employer may be liable for discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., if an employee is subject to a hostile work environment based on her race. To recover, a plaintiff must show: (1) she was subjected to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was severe and pervasive so as to alter the conditions of her employment and create a hostile or abusive work environment; and (4) there is a basis for employer liability. Regarding liability, if the supervisor created the hostile work environment and the employee suffered a tangible employment action, the employer is strictly liable. If the employee does not suffer a tangible employment action, the employer may raise an affirmative defense involving its use of reasonable care in preventing and correcting the harassment and the employee's failure to take advantage of any preventive or corrective opportunities.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN10]Regarding discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., if the coworkers created the hostile work environment, the employer is liable only when the employee shows the employer was negligent in discovering or remedying the harassment.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN11]When a plaintiff alleges both her supervisor and her coworkers created a hostile work environment, the court looks at the totality of the circumstances in evaluating her claim. To prevail, a plaintiff must show her work environment was both subjectively and objectively hostile.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN12]For alleged incidents of racism to be relevant to showing the severity or pervasiveness of a plaintiff's hostile work environment, the plaintiff must know of them.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN13]When the plaintiff has not produced any direct evidence of retaliation, the court analyzes her claim under the familiar McDonnell Douglas burden-shifting method. To establish a prima facie case of retaliation, the plaintiff must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action subsequent to her participation; and (3) a causal connection exists between the adverse employment action and her participation in the protected activity.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN14]Under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., not everything that makes an employee unhappy is an actionable adverse action. For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

**COUNSEL:** FOR PLAINTIFF: Michael K. Havrilesko, Havrilesko & Associates, Rockford, IL.

FOR DEFENDANT: Kevin J. Luther, Heyl, Royster, Voelker & Allen, Rockford, IL.

FOR DEFENDANT: Pamela J. King, Micro Switch, Freeport, IL.

**JUDGES:** PHILIP G. REINHARD, JUDGE, UNITED STATES DISTRICT COURT.

**OPINION BY:** PHILIP G. REINHARD

**OPINION**

***MEMORANDUM OPINION AND ORDER***

*Introduction*

On August 28, 1998, plaintiff Dorothy Turner filed a complaint against defendant Micro Switch, a division of Honeywell, Inc. ("Micro Switch"), pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e et seq. [1] Micro Switch has filed

2001 U.S. Dist. LEXIS 63, *; 80 Empl. Prac. Dec. (CCH) P40,514

a motion for summary judgment pursuant to
Fed.R.Civ.P. 56, a request for oral argument, and a mo-
tion to strike certain affidavits Turner proffered in sup-
port of her response to Micro Switch's Rule 56 motion.
Turner has orally moved to strike additional materials
Micro Switch filed in response to Turner's LR56.1(b)
statement of additional facts. [*2] This court has juris-
diction over Turner's claims pursuant to 28 U.S.C. §
1331 and 42 U.S.C. § 2000e-5(f)(3). Venue is proper as
the alleged events occurred in this district and division.
See 28 U.S.C. § 1391(b).

    1   Turner is also a plaintiff in another lawsuit
    currently pending before this court, Thomas v.
    Honeywell, No. 00 C 50022. Although neither
    party has addressed the Thomas case, the court
    notes ordinary principles of issue and/or claim
    preclusion apply.

*Facts*

Turner (African-American), hired in 1971, currently
works at Honeywell's Micro Switch division in Depart-
ment 280, a department which places resistors or conduc-
tors on ceramic capacitors through thick film printing.
(LR56.1(a) PP 1-2) Turner was a Group Leader for thir-
teen years but in 1995 all Group Leader positions were
eliminated in Micro Switch's factories. (Id. P 4) At that
time, Turner's job title changed to FN4 Team Member.
When the company [*3] abolished the Group Leader
position, it simultaneously created the Technical Associ-
ate position. (Id. P 5) This position required many of the
skills of the Group Leader position, but required a higher
level of technical expertise. Employees who were previ-
ously classified as Group Leaders were given the first
opportunity to fill the Technical Associate positions. In
filling the Technical Associate positions, candidates'
personnel files were reviewed and the most qualified
candidates were interviewed. If two or more candidates
were equally well qualified and did equally well in the
interview process, seniority was generally used to break
the tie. (Id. P 6)

On December 17, 1995, Turner, who held a Group
Leader position on the second shift at the time, applied
for a Technical Associate position. She and Fred Balles
(Caucasian), a first shift Group Leader, were the only
candidates. Balles was chosen for the position. Micro
Switch states its reason for choosing Balles was because
he was deemed to have stronger technical skills. (Id. P 8)
Turner did not complain to any member of management
that she believed the decision to chose Balles was ra-
cially motivated. (Id. P 9) [2] [*4]

    2   In her affidavit, submitted in response to Mi-
    cro Switch's motion, Turner claims she com-

plained to Human Resources about the decision.
(Pl. App., Exh. A, Turner Aff., P 3) However, in
her deposition, Turner stated she did not com-
plain to anyone. The affidavit impermissibly con-
flicts with Turner's earlier deposition testimony
so as to create only a sham issue of fact, and the
court credits her deposition testimony. See Bank
of Ill. v. Allied Signal Safety Restraint Sys., 75
F.3d 1162, 1170 (7th Cir. 1996).

A few months later, in early 1996, Balles was pro-
moted to another Technician position and as a result,
again the first shift Technical Associate position became
available. Five candidates applied, including Turner.
Cathy Wilson, with eighteen years of service (as com-
pared to Turner's twenty-five years of service at that
time) was chosen. Micro Switch states its reason for
choosing Wilson was because the department supervisor
thought she would be a better fit for the job because of
her technical [*5] skills. (Id. P 10) There is no evidence
in the record as to whether Turner complained at the time
to any member of management that she believed the de-
cision was racially motivated.

In July 1997, an FN4 Team Member position on first
shift was posted in Department 280. At that time, Turner
held an FN4 Team Member position on the second shift
in that department. Nine candidates applied for the job.
John Ginger, who had more seniority than Turner, was
chosen. (Id. P 11) As its articulated reason for its deci-
sion, Micro Switch states the hiring supervisor thought
the candidates were close in qualifications and used sen-
iority as the tie breaker. (Id.)

According to Turner, a supervisor, Mike Entmeier,
told a coworker that Turner would never work on first
shift as long as he had anything to do with it. (LR56.1(b)
P 53) After she was turned down for the promotion,
Turner took an FN3 Team Member position on first shift
in another department, with no wage protection. (It is not
clear from the record whether this was a lower paying
position. LR56.1(a) P 12) She worked in that department
from March 10, 1997, through November 14, 1997.

On November 14, 1997, Tom Mabrey, Vice Presi-
dent [*6] of Micro Switch's electronics business, and
George "Ralph" Hill, Human Resources Director, met
with Turner. She was then transferred to a first shift FN4
Team Member position in Department 280, effective
November 17, 1997, with back pay. The parties dispute
the company's motivation for this transfer. The company
states it made the decision to transfer Turner based on
the conversation between Turner, Mabrey and Hill (al-
though it never explains to the court what was said dur-
ing this conversation). Turner maintains the company
transferred her to the position she wanted because of the
formal complaint she had filed with the United States

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 17 of 38

2001 U.S. Dist. LEXIS 63, *; 80 Empl. Prac. Dec. (CCH) P40,514

Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP"), which touched off an investigation. (LR56.1(b) P 57)

After Turner returned to Department 280, her supervisor, Charmaine Munz, was cold and unfriendly to her. (*Id.* P 58) During monthly meetings, Munz told the employees they were overstaffed and the possibility existed that some employees would be laid off. Turner interpreted these comments as Munz intentionally causing the employees to resent Turner because she was the most senior member of the department and would cause [*7] others to be laid off. Thereafter, Turner states coworkers refused to return her greetings, refused to recertify her on jobs she had done for years, and falsely accused her of failing to follow procedures. (*Id.* P 60) She was also falsely accused of lying on her time card.

There is evidence coworkers used racial slurs at work, including use of the word "nigger," although Turner never heard such racial slurs and specifically never heard the word "nigger" used in her presence. (LR56.1(a) PP 24-26; Pl. Exh. 2, Robinson Aff., PP 3-5, Pl. Exh. 3, Schwartz Aff., PP 3, 5) Turner reported use of the word "nigger" to her supervisor, Mark Gallagher. (LR56.1(b) P 70) He told her there was nothing he could do about it because Turner's knowledge was based on hearsay. (*Id.*)

### Preliminary Matters

Micro Switch has moved to strike the affidavits of Debbie Schwartz and Victoria Robinson and portions of Turner's affidavit, all of which were filed in support of Turner's response to Micro Switch's motion for summary judgment and corresponding LR56.1(a) statement of facts. Micro Switch argues Schwartz' and Robinson's affidavits should be stricken because they do not address any incidents of [*8] harassment or retaliation against Turner.

It is true incidents about which Schwartz and Robinson attest, if Turner never knew about them, are not "harassment" of Turner. *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 2000 WL 1779187, at *7 (7th Cir. 2000). However, such evidence could be relevant to show the employer's constructive knowledge of the harassment. 233 F.3d at 1046, *Id.* *7 n.8. The court finds Micro Switch's argument goes to the weight to be accorded such testimony, not its admissibility, and will be further discussed *infra*. Likewise, the court finds the majority of Micro Switch's arguments regarding portions of Turner's affidavit go to the weight to be accorded her statements, not the admissibility, which the court will address *infra*. Micro Switch's motion to strike is denied.

At a status hearing on December 6, 2000, Turner orally moved to strike additional materials Micro Switch

submitted in support of its reply brief and responses to Turner's LR56.1(b) statement of additional facts (the "Hill Affidavit II") as being in derogation of LR56.1. The court agrees. [HN1]Under LR56.1(a), the moving party may controvert additional material facts submitted [*9] by the opposing party pursuant to LR56.1(b). However, its denials must be based on materials already part of the record unless the opposing party's LR56.1(b) statement of additional facts raises unanticipated new issues entirely outside the scope of the moving party's motion for summary judgment. Such is not the case here, and Turner's oral motion to strike the Hill Affidavit II is granted.

### Analysis

[HN2]Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The question to be determined is whether, if the record of the summary judgment proceeding were the record at trial, a reasonable fact finder could find in favor of the non-moving party. *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993). The record is to be examined in the light most favorable to Turner, but conclusory allegations will not suffice. *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999). [*10] Intent and credibility are crucial issues in employment discrimination cases and, therefore, the summary judgment standard is applied with added rigor in such cases, but summary judgment will not be defeated just because motive or intent are involved. *Id.* (citations omitted).

In this case, Turner alleges three theories of discrimination: she was discriminatorily denied promotions because of her race, she was subjected to a racially hostile work environment, and she was retaliated against because she complained to the OFCCP and the Equal Employment Opportunity Commission ("EEOC") about race discrimination. The court will address each theory separately.

### B. Race Discrimination

Micro Switch argues Turner is time-barred from pursuing claims based on two promotion decisions she challenges, and the court agrees. The first promotion decision at issue was in December 1995 and the second promotion decision at issue was in early 1996. (LR56.1(a) PP 7, 10) Turner did not file her complaint with the EEOC until March 25, 1998. (*Id.* P 38) [HN3]Under Title VII, a charging party must file a charge with the EEOC within 300 days after the alleg-

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 18 of 38

2001 U.S. Dist. LEXIS 63, *; 80 Empl. Prac. Dec. (CCH) P40,514

edly unlawful employment practice occurred. [*11] *42 U.S.C. § 2000e-5(e)(1)*. Each promotion was a discrete decision which Turner knew about at the time the decision was made. Based on these facts, the continuing violation theory does not apply and her promotion claims based on the 1995 and 1996 promotions are time-barred. *See Jones v. Merchants Nat'l Bank & Trust Co., 42 F.3d 1054, 1058 (7th Cir. 1994)* (continuing violation inapplicable to failure to promote claims). Likewise, any claims of discriminatory pay based on her failure to obtain these promotions are likewise barred. *See id.*

Turner also contests a July 1997 promotion to the first shift FN4 position. (LR56.1(a) P 11) [HN4]Under Title VII, it is unlawful for an employer to decide not to promote an employee because of her race. *See 42 U.S.C. § 2000e-2(a)(1)*. The two accepted ways of establishing that an employer has discriminated are by direct evidence (taking the form of, "I did not promote you because of your race"), or by indirect evidence. *Hasham v. California State Bd. of Equalization, 200 F.3d 1035, 1044 (7th Cir. 2000)*. Turner is apparently proceeding under the indirect [*12] method of proof, as she has proffered no direct evidence of discrimination.

[HN5]Under the indirect, burden-shifting method, Turner must initially establish a prima facie case of unlawful discrimination by demonstrating: (1) she is in a protected class; (2) she was qualified for the promotion; (3) she did not receive the promotion despite her qualifications; and, (4) a person not in the protected class was promoted instead. *Id. at 1044.* [3] Turner has done this. The first, second, and fourth elements are not in dispute. (Def. Memo., p. 12) As for the third element, Micro Switch argues Turner did not suffer an adverse employment action because in November of 1997, the company placed Turner in the first shift FN4 position with back pay. While such action would go to the issue of damages, it does not erase the fact that in July 1997 Turner suffered an adverse employment action.

> 3  Some of the cases list the prima facie elements somewhat differently, stating the plaintiff must establish, as the fourth element, that the employee promoted was not more qualified than the plaintiff. *See, e.g., Payne v. Milwaukee County, 146 F.3d 430, 434 (7th Cir. 1998).*

[*13]  The burden now shifts to Micro Switch, which must articulate a legitimate, non-discriminatory reason for why Turner was not promoted. *See Ghosh v. Indiana Dep't of Envtl. Mgmt., 192 F.3d 1087, 1091 (7th Cir. 1999)*. Micro Switch has done this; according to the hiring supervisor, she thought Turner and Ginger were close in qualifications and used seniority to break the tie.

The burden now shifts back to Turner to produce evidence from which a reasonable factfinder could conclude Micro Switch's articulated reason is pretextual, meaning it is a lie or completely lacks a factual basis. *Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000); Perdomo v. Browner, 67 F.3d 140, 145 (7th Cir. 1995)*. Turner has failed to produce any evidence from which a reasonable factfinder could infer pretext. Turner never even explicitly contests that she was more qualified than Ginger. (LR56.1(b) P 11) Instead, Turner apparently argues that seniority was not the deciding factor in the previous two promotions that went to Balles and Wilson. Yet, for this argument to succeed Turner would have to show she was at least as qualified as Balles and Wilson because [*14] she admits seniority comes into play under Micro Switch's policy only if the applicants are equally qualified. (LR56.1(a) P 6) Turner's evidence in support of this is her own self-serving statement to that effect. (LR56.1(b) PP 8, 10) [HN6]It is well-established that a plaintiff's own self-serving statements about her qualifications is insufficient to carry the day. *See, e.g, Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1114 (7th Cir. 1998)* (employee's self-serving statements about her ability do not establish pretext); *Rabinovitz v. Pena, 89 F.3d 482, 487 (7th Cir. 1996)* (plaintiff's own opinions about his performance or qualifications do not give rise to a material factual dispute).

Turner also apparently relies on Entmeier's statement, that Turner would never work on first shift as long as he had anything to do with it, as evidence of discrimination. Turner's knowledge of this statement is based on hearsay, and [HN7]the court does not consider hearsay statements that are otherwise inadmissible at trial at the summary judgment stage. *Hong v. Children's Mem'l Hosp., 993 F.2d 1257, 1265 (7th Cir. 1993), cert. denied,* [*15] *511 U.S. 1005, 128 L. Ed. 2d 48, 114 S. Ct. 1372 (1994)*. Even if the court were to consider the statement, Turner's inference that Entmeier's statement somehow refers to her race is impermissibly speculative. Thus, Turner's failure-to-promote claim fails. [4]

> 4  The court's disposition of the promotion decisions at issue in the context of Turner's discrimination claim apply with equal force to her racial harassment claim.

Turner also claims she was discriminatorily denied pay raises. In support of this claim, Turner proffers only her own testimony that she felt she should be at the top of the pay scale because of her seniority and mastery of the job. However, she has offered no evidence of other non-protected employees in similar jobs with less seniority than her who were earning higher wages than her. This is the kind of evidence Turner should have proffered in support of her claim. *See, e.g., Chambers v.*

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 19 of 38

2001 U.S. Dist. LEXIS 63, *; 80 Empl. Prac. Dec. (CCH) P40,514

*American Trans Air, Inc.*, 17 F.3d 998, 1003-04 (7th Cir.), *cert. denied*, [*16] 513 U.S. 1001, 130 L. Ed. 2d 419, 115 S. Ct. 512 (1994). In addition to failing to establish a prima facie case of wage discrimination, Turner has not produced any circumstantial evidence tending to show Micro Switch intended to suppress her wages based on her race. *See Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 525 (7th Cir. 1994) ([HN8]plaintiff with Title VII wage discrimination claim must meet demanding standard of persuading factfinder employer intended to discriminate). Thus, her Title VII wage discrimination claim fails.

### C. Racial Harassment

Turner also contends she was subjected to racial harassment at work. [HN9]An employer may be liable for discrimination under Title VII if an employee is subject to a hostile work environment based on her race. *Mason*, 2000 WL 1779187, at *5. To recover, Turner must show: (1) she was subjected to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was severe and pervasive so as to alter the conditions of her employment and create a hostile or abusive work environment; and (4) there is a basis for employer liability. *Id.* Regarding liability, if the supervisor [*17] created the hostile work environment and the employee suffered a tangible employment action, the employer is strictly liable. *Id.* If the employee does not suffer a tangible employment action, the employer may raise an affirmative defense involving its use of reasonable care in preventing and correcting the harassment and the employee's failure to take advantage of any preventive or corrective opportunities. *Id.* n.4. [HN10]If the coworkers created the hostile work environment, the employer is liable only when the employee shows the employer was negligent in discovering or remedying the harassment. *Id.* *5.

Here, [HN11]Turner is alleging both her supervisor, Munz, and her coworkers created a hostile work environment (Compl. p. 5, P V), so the court will look at the totality of the circumstances in evaluating her claim. *See Mason*, 2000 WL 1779187, at *6. To prevail, Turner must show her work environment was both subjectively and objectively hostile. Turner's claim fails because from an objective viewpoint she has not, at a minimum, shown she was subjected to harassment so severe and pervasive as to alter the conditions of her employment and create a hostile or abusive [*18]   work environment. *See McPhaul v. Board of Comm'rs*, 226 F.3d 558, 566 (7th Cir. 2000). Turner alleges when she received the promotion to the FN4 position on first shift in department 280, during monthly meetings Munz raised the possibility of layoffs. (LR56.1(b) P 59) Turner interpreted Munz' statements as stirring hostility among coworkers against Turner. (*Id.*) Turner reasons that since she was the newest yet most senior employee in the department, coworkers blamed her for causing them to get laid off. Turner's theory is based entirely on speculation; by Turner's own account, Munz never mentioned Turner by name, never implied that Turner was the cause of any layoffs, and no layoffs ever occurred.

Even if Turner's speculative theory were accepted as true, it does not support a claim that she was subjected to a hostile work environment because of her race. Turner alleges that as a result of Munz' comments during the meeting, coworkers would not return her greetings, refused to recertify her on jobs she had done for many years, falsely accused her of failing to follow procedures, and falsely accused her of time card violations. (LR56.1(b) PP 60-61) By Turner's own [*19]   theory, these actions were borne out of resentment to Turner because of her seniority, not her race.

Turner also contends she was subjected to a racially hostile and offensive work environment because racial slurs, including the racially offensive word, "nigger," were used in the workplace. (Pl. Resp., p. 3) However, Turner's evidence in support of this contention is lacking. First, Turner herself never heard any racial slurs, and the impact of second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff. *McPhaul*, 226 F.3d at 567. Second, Turner has offered affidavits from two coworkers who state they heard racial slurs in the workplace, but neither coworker offers more detail than that.

Specifically, Victoria Robinson states she has heard white employees use racial slurs, including the term "nigger," and that it was common knowledge the second shift was referred to as the "nigger shift." (Pl. Exh. 2, Robinson Aff., PP 3-4) She does not specify how often she heard such slurs, when she heard them, who made them, or to whom they were directed. *See McPhaul*, 226 F.3d at 567. In fact, her affidavit was originally [*20]   drafted for her to attest that she had "often" heard white employees use racial slurs, but she scratched out the word "often."

The statements of a coworker, Debbie Schwartz, are equally vague. (Pl. Exh. 3, Schwartz Aff., P 3) Moreover, Schwartz does not state that she told Turner about the racial slurs she heard; in fact, she crossed out the typed paragraph in her affidavit which stated she had reported the racial slurs to Turner. (*Id.*) [HN12]For alleged incidents of racism to be relevant to showing the severity or pervasiveness of a plaintiff's hostile work environment, the plaintiff must know of them. *Mason*, 2000 WL 1779187, at *7. In short, the conclusory allegations in the affidavits of Schwartz and Robinson, completely lacking specific concrete facts, do not create a factual dispute. *McPhaul*, 226 F.3d at 567 (coworker's

Case 1:07-cv-06996   Document 15-2   Filed 02/07/2008   Page 20 of 38

2001 U.S. Dist. LEXIS 63, *; 80 Empl. Prac. Dec. (CCH) P40,514

use of racial epithet "nigger" on a weekly basis insufficient to establish a hostile work environment); *see also Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (district court properly struck affidavits with conclusory allegations, completely lacking specific, concrete facts).

The court [*21] also finds Turner's reliance on *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668 (7th Cir. 1993), is inapposite. In *Rodgers*, 12 F.3d at 675, the plaintiff's supervisor directed racial epithets at the plaintiff, including use of the word "nigger" in the plaintiff's presence on two occasions. The Seventh Circuit stated that perhaps no single act can more quickly create an abusive working environment than a supervisor's use of the word "nigger" in the presence of his subordinates. *Id.* The plaintiff also produced evidence of the profound psychological effect the supervisor's racist comments had on him. Here, Turner does not have evidence of any supervisor directing racial comments at her, and has not shown that any racial slurs interfered with her work performance or were physically threatening or humiliating to her.

Turner also points to the purported statement of the General Manager, Ron Sieck, who allegedly told Dennis Jordan, then the President of the Freeport branch of the NAACP, that using the word "nigger" was not grounds for firing an employee. (LR56.1(b) P 80) Turner argues Sieck's statement is evidence of the company's lackadaisical [*22] attitude towards race discrimination and harassment. Because she has not brought forth evidence tending to show discrimination or harassment, the court finds Sieck's statement to be of little value.

**D. Retaliation**

Turner also alleges she was retaliated against after filing a complaint with the OFCCP in August 1997 and an EEOC charge in March 1998. (LR56.1(b) P 45; Def. Exh. 4, Compl. P 7(b)(i), p. 6, P VII) [HN13]Because Turner has not produced any direct evidence of retaliation, the court will analyze her claim under the familiar *McDonnell Douglas* burden-shifting method. To establish a prima facie case of retaliation, Turner must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action subsequent to her participation; and (3) a causal connection exists between the adverse employment action and her participation in the protected activity. *Bell v. Environmental Protection Agency*, 232 F.3d 546, 554, 2000 WL 1661834 (7th Cir. 2000).

Many of the facts which form the basis of Turner's discrimination and harassment claims also form the basis of her retaliation claim. Specifically, Turner alleges [*23] she was denied promotions in 1997, 1998, and 1999 in retaliation for filing charges with the OFCCP

and EEOC. (LR56.1(b) P 46) The 1997 promotion occurred prior to the filing of any discrimination charges and, therefore, cannot form the basis of a retaliation claim.

As for 1998 and 1999, Turner claims she applied for several promotions in 1998 and 1999 but was not interviewed or selected. Although Micro Switch claims it has no records of Turner applying for any positions during these two years, for purposes of summary judgment the court will accept Turner's version of events. Even so, she has failed to offer any evidence showing a causal connection between the promotion decisions and her filings. Turner does not identify the positions for which she applied, the hiring supervisor or whether the hiring supervisor even knew of Turner's protected activity. Turner has failed to proffer evidence in support of the third element of a prima facie case of retaliation based on any 1998 and 1999 promotion decisions, and her claim fails.

Turner claims Munz was cold and unfriendly to her and she was chastised for talking with a coworker in retaliation for filing a charge with the OFCCP and EEOC. [*24] (LR56.1(b) PP 58, 63) Turner states her coworkers' unfriendly behavior (*Id.* PP 60-61) was also in retaliation for filing the charges. [HN14]Under Title VII, not everything that makes an employee unhappy is an actionable adverse action. *Bell*, 2000 WL 1661834, slip op. at 15. "For an employment action to be actionable, it must be a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)). Refusing to greet Turner or being "cold" and unfriendly to her are trivial matters that do not rise to the level of actionable retaliation. *Id.; see also Drake*, 134 F.3d at 885-86 (shunning by coworkers was not an adverse action). [5]

   5   To the extent Turner's complaint includes class action allegations, *see* Def. Mot., p. 3, she has failed to request class certification and has waived the issue. In any event, in light of the dismissal of her individual claims, any class certification is moot. *Chambers*, 17 F.3d at 1006.

[*25] **Conclusion**

For the reasons set forth above, Micro Switch's Rule 56 motion is granted, its motion to strike is denied, and its request for oral argument is denied. Turner's motion to strike is granted. This cause is hereby dismissed in its entirety.

**ENTER:**

2001 U.S. Dist. LEXIS 63, *; 80 Empl. Prac. Dec. (CCH) P40,514

**PHILIP G. REINHARD, JUDGE**                    **DATED:** *January 3, 2001*

      **UNITED STATES DISTRICT COURT**

LEXSEE



Positive
As of: Feb 06, 2008

**WILLIAM HARRIS and JAMAL HARRIS, on behalf of themselves and other simi-
larly situated, Plaintiffs, -against- INITIAL SECURITY, INC., Defendant.**

**05 Civ. 3873 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2007 U.S. Dist. LEXIS 18397; 100 Fair Empl. Prac. Cas. (BNA) 1139**

**March 7, 2007, Decided
March 7, 2007, Filed**

**CORE TERMS:** termination, promotion, class certifica-
tion, class member, guard, commonality, class action,
hiring, security guards, injunctive relief, proposed class,
citations omitted, dark-skinned, discipline, overtime,
questions of law, discriminatory practices, predominate,
statistical, typicality, terminated, fired, individual mem-
bers, individual's claim, declaratory relief, monetary,
hired, similarly situated, discriminatory, compensatory

**COUNSEL:** [*1] For William Harris on behalf of him-
self and others similarlly situated, Jamal Harris on behalf
of himself and others similarly situated, Plaintiffs: Ste-
ven Ian Locke, LEAD ATTORNEY, Jeffrey I. Schul-
man, Carabba Locke LLP, New York, NY.

For Initial Security, Inc., Defendant: Jane B. Jacobs,
LEAD ATTORNEY, Joshua D. Rose, Klein, Zelman,
Rothermel & Dichter LLP, New York, NY.

**JUDGES:** GEORGE B. DANIELS, United States Dis-
trict Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge:

Plaintiffs William Harris and Jamal Harris (no rela-
tion) ("Plaintiffs") initiated this action, on behalf of
themselves and others similarly situated, against their

former employer, defendant Initial Security, Inc., for race
and color discrimination in violation of Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. §
2000e, et seq. Plaintiffs now move for class certification
pursuant to Fed. R. Civ. P. 23. The motion for class certi-
fication is denied.

**BACKGROUND**

Defendant provides security services for various cli-
ents at sites throughout New York City, including, since
July 1, 2000, the Metropolitan Transit [*2] Authority
("MTA") in its headquarters at 2 Broadway in New York
City. Compl. P 3; Affidavit of Robert Rahle ("Rahle
Aff.") P 6. Defendant hired an Administrative Manager,
who is Hispanic, at 2 Broadway in August 2000. Affida-
vit of Xavier Ruiz ("Ruiz Aff.") P 3. The Administrative
Manager had authority to make decisions regarding hir-
ing, promotion, discipline, and termination. Id. at P 4. In
June 2001, that individual was promoted to Site Man-
ager, the highest ranking position at 2 Broadway. Id. at P
5.

Plaintiff William Harris was hired as Assistant Site
Commander at 2 Broadway in June 2000. Compl. P 6.
When the new Administrative Manager arrived in Au-
gust 2000, he was one-level above Harris in the chain-of-
command. Ruiz Aff. P 3. On January 17, 2001, William
Harris was fired by the Administrative Manager. Accord-
ing to Harris, he was fired because several guards told
the Administrative Manager that, at a pre-shift meeting,
William Harris said that the MTA was displeased with
Defendant's work, and that a petition should be circulated

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 24 of 38

2007 U.S. Dist. LEXIS 18397, *; 100 Fair Empl. Prac. Cas. (BNA) 1139

to get another guard fired. Compl. P 25; Affidavit of William Harris ("W. Harris Aff.") P 13 (attached to Affirmation of Steven I. Locke ("Locke [*3] Aff.") Ex. G).

Plaintiff Jamal Harris was hired by the Administrative Manager as a Shift Supervisor in December 2000. Affidavit of Jamal Harris ("J. Harris Aff.") (Locke Aff. Ex. H) P 1; Compl. PP 9-10. The Administrative Manager fired Jamal Harris in February 2001, allegedly because Harris signed out of the logbook at 10:00 p.m., yet was seen leaving 2 Broadway at around 7:00 p.m. J. Harris Aff. P 14; Ruiz Aff. P 10; Compl. P 29.

After their terminations, Plaintiffs filed administrative charges with the Equal Employment Opportunity Commission ("EEOC")--Jamal Harris on June 14, 2001, and William Harris on July 10, 2001. Compl. P 13; Ruiz Aff. Ex. 1 and Ex. 2. The Administrative Manager sent written responses to the EEOC essentially denying all the allegations made by Plaintiffs. Ruiz Aff. Ex. 3 and Ex. 4. The EEOC issued its Determination on June 28, 2004, finding that "reasonable cause exists to believe that, from on or about September 2000 to present, [Defendant] subjected [Plaintiffs] and a class of similarly-situated individuals to a pattern or practice of discrimination based on their race (Black), and/or color (dark-skinned) and to retaliation." EEOC Determination (Locke [*4] Aff. Ex. C); Compl. P 13. After attempts at reconciliation were unsuccessful, the EEOC issued right-to-sue letters on January 27, 2005. Compl. P 13.

Plaintiffs filed the instant action on April 15, 2005, on behalf of themselves and others similarly situated, alleging that Defendant, through the Administrative Manager, implemented and maintained a policy of discrimination towards black and dark-skinned employees in promotions, terminations, overtime, and discipline, creating a hostile work environment and resulting in retaliatory terminations, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Id. PP 35-38. Plaintiffs seek declaratory and injunctive relief, as well as a judgment in the amount of $ 10,000,000.00 on each claim, plus costs, interest, and attorneys' fees.

## ALLEGATIONS OF CLASS-WIDE DISCRIMINATION

Plaintiffs now move to certify a class consisting of "all black and dark-skinned employees of Defendant, employed by that company at 2 Broadway in Manhattan for the period from September 2000 to June 28, 2004 who were either terminated, passed over for promotion, subject to discipline, harassed [*5] and/or retaliated against on the basis of their race or color, i.e., the fact that they were dark-skinned." Plaintiffs' Memo of Law ("Pl. Memo") at 10-11. During the proposed class period,

approximately 1,049 security guards worked for Defendant at 2 Broadway, 55% of whom--which is approximately 577 employees--were black. Expert Report of Allen Mazur ("Mazur Report") (Locke Aff. Ex. B) at 2.

Plaintiffs themselves claim that they were terminated as a result of Defendant's discriminatory practices. Pl. Memo at 2, 8; J. Harris Aff. PP 13-14; W. Harris Aff. PP 13-14. They also claim to "know" twenty-five other black security guards "who were terminated because of [Defendant's], and more specifically [the Administrative Managers's] policy of discriminating against non-Hispanics." [1] J. Harris Aff. P 15; W. Harris Aff. P 16. One of those guards submitted his own affidavit in support of class certification claiming that his termination was racially motivated. Affidavit of Robert Allen ("Allen Aff.") P 7. [2] With respect to promotions, Plaintiffs name only one black security guard that allegedly asked for a promotion and was denied, and two black guards who they claim did not receive [*6] promotions despite being more qualified than Hispanic guards who did. J. Harris Aff. P 12; W. Harris Aff. P 12. Plaintiffs also provide the names of four Hispanic guards who they say were unqualified for promotions but were nonetheless promoted ahead of more qualified black guards. J. Harris Aff. PP 6-7, 12; W. Harris Aff. PP 6-7, 12.

1    Plaintiffs provide no factual basis for how they "know" the reason why each individual they name was fired, and no factual allegations supporting their bald assertion that these individuals were fired because of Defendant's discriminatory policies.

2    This affidavit was not submitted with Plaintiffs' motion for class certification, but by Order dated December 18, 2006, this Court granted Plaintiffs' motion for an enlargement of time, pursuant to Fed. R. Civ. P 6(b)(2), permitting them to file the affidavit.

Plaintiffs also claim that Hispanic employees were treated much more leniently for violating Defendant's employment policies. Several Hispanic guards, they allege, violated [*7] company policies but were not disciplined, while black employees were disciplined--even terminated--for the same violations as those Hispanic guards who were not. J. Harris Aff. P 10; W. Harris Aff. P 10. For example, they name four black security guards, and one Arab guard, who they claim were either terminated or harassed by the Administrative Manager for minor violations, the same violations that garnered no disciplinary action when committed by Hispanics. As for overtime, Plaintiffs allege that several black security guards--including the three they name in their affidavits-- were forced by a Hispanic supervisor to work overtime,

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 25 of 38

2007 U.S. Dist. LEXIS 18397, *; 100 Fair Empl. Prac. Cas. (BNA) 1139

even though they had young children to care for at home, while similarly situated Hispanic guards were not. J. Harris Aff. P 9; W. Harris Aff. P 9. Finally, Plaintiffs allege that the Administrative Manager made several racist remarks towards blacks. Specifically, they claim that the Administrative Manager referred to the black guards as "a bunch of bad apples" that he intended to "weed out," and that he once told a Hispanic guard that "black people are no good." J. Harris Aff. PP 8, 11; W. Harris Aff. PP 8, 11.

In support of their allegations of discrimination, [*8] Plaintiffs submitted a report from their expert, a professor at Syracuse University with a Ph.D. in sociology from Johns Hopkins University. The expert, however, found no evidence of discrimination in terminations:

> [T]here is no indication that it [termination rates] was systematically different for blacks than for Hispanics. The termination rate in 2001 was especially high, with roughly 15% of employees quitting or being fired each month, but the burden fell *equally on both groups.* The reason so many more blacks went out the door in 2001 is that so many more blacks were working, hence so many more were at risk of termination. . . . Of employees whose terminations were explained, 54% quit, 38% were discharged, and 8% left for miscellaneous other reasons. There was *virtually no difference between blacks and Hispanics in the reason for termination."*

Mazur Report at 7-8 (Lock Aff. Ex. B) (emphasis added). Thus, according to Plaintiffs' own expert, there is "no indication of unequal treatment in terminations" at 2 Broadway. Id. at 11. Moreover, the expert conducted no analysis of, and provided no opinion on, whether there was discrimination in promotions, [*9] discipline, or overtime.

Plaintiffs' expert did find, however, that in 36 of the 46 months following the summer of 2000, the hiring rate of Hispanics at 2 Broadway was greater than the hiring rate of blacks at 2 Broadway. Id. at 9. Therefore, he concluded, the reason black employment decreased over the four-year period at 2 Broadway was because "[b]lack hiring was insufficient to compensate for black terminations." Id. at 10.

## CLASS CERTIFICATION

A "Title VII class action, like any other class action, may only be certified if the trial court is satisfied after a

rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). Pursuant to Rule 23(a), certification of a class is only appropriate if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. 23(a). Plaintiffs' claim [*10] must also fit within one of the three categories enumerated in Rule 23(b). [3] Fed. R. Civ. P. 23(b); Heerwagen v. Clear Channel Communs., 435 F.3d 219, 225 (2d Cir. 2006). [4]

3    The categories are:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 26 of 38

2007 U.S. Dist. LEXIS 18397, *; 100 Fair Empl. Prac. Cas. (BNA) 1139

the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b).

[*11]

4  Rule 23 also "contains an implicit requirement that the proposed class be precise, objective and presently ascertainable." Bakalar v. Vavra, 237 F.R.D. 59, 64 (S.D.N.Y. 2006) (citations omitted). A class consisting of "dark-skinned" employees is not ascertainable because there is no objective criteria to which the Court could refer to determine whether someone is sufficiently "dark-skinned" to be a class member. See, e.g, Fogarazzo v. Lehman Bros., 232 F.R.D. 176, 181 (S.D.N.Y. 2005) ("An identifiable class exists if its members can be ascertained by reference to objective criteria."); Hnot v. Willis Group Holdings Ltd., 228 F.R.D. 476, 481 (S.D.N.Y. 2005) ("A class is ascertainable when defined by objective criteria that are administratively feasible, without a subjective determination.").

But while a class consisting of "dark-skinned" employees is not readily identifiable, a class of black employees is. See, e.g., Farber v. City of Paterson, 440 F.3d 131, 137 (3d Cir. 2006) ("Simply put, some groups, particularly those deemed to be distinguishable from others

by immutable characteristics, such as African-Americans, women, and the mentally retarded, are so clearly accepted as objectively identifiable that no extended analysis is needed.").

Therefore, even if Plaintiffs could satisfy Rules 23(a) and (b), their proposed class would be limited to black employees only.

[*12]  The "rigorous analysis" that district courts must undertake includes the obligation to make determinations as to whether each of the Rule 23 requirements have been met. See Miles v. Merrill Lynch & Co., Inc. (In re Initial Public Offering Sec. Lit.), 471 F.3d 24, 41 (2d Cir. 2006). In making these determinations, the court may make factual findings and resolve factual disputes, even if the determination of a Rule 23 requirement overlaps with an issue that goes to the merits of the plaintiff's claim. Id. Moreover, there must be more than "some showing" that each Rule 23 requirement has been satisfied. [5] Id. at 42. And finally, an expert's testimony cannot establish a Rule 23 requirement "simply by being not fatally flawed." Id.

5  Previously, some courts within this Circuit had applied a "some showing" standard of proof in deciding whether each Rule 23(a) requirement had been met. See In re Initial Public Offering Sec. Lit., 471 F.3d at 35, 35 n.5 (discussing cases that have used the "some showing" standard).

[*13]  A. The Rule 23(a) Requirements

1. Numerosity

During the proposed class period, from 2000 to 2004, Defendant employed about 577 black security guards at 2 Broadway. Of those 577 guards, Plaintiffs name only 29 black employees that they say were terminated, passed over for promotion, forced to work overtime, or disproportionately disciplined because of Defendant's alleged discriminatory practices. Defendant, however, does not challenge Plaintiffs' assertion that the proposed class is sufficiently numerous.

2. Commonality and Typicality

Defendant's do, however, argue that Plaintiffs cannot satisfy the commonality and typicality requirements. Commonality is satisfied "if plaintiffs' grievances share a common question of law or of fact." Freeland v. AT & T Corp., 238 F.R.D. 130, 140 (S.D.N.Y. 2006) (citations omitted). Even a single common legal or factual question is sufficient. Id. In discrimination cases, commonality means that the "defendants discriminated against class members in the same general fashion." Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79, 238 F.R.D. 82, 94 (S.D.N.Y. 2006) (citation omitted). Claims [*14]  are

2007 U.S. Dist. LEXIS 18397, *; 100 Fair Empl. Prac. Cas. (BNA) 1139

typical "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Id. (citation omitted). The factual background of each named plaintiff's claim need not be identical to the claims of all class members for typicality to be satisfied. Rather, if the disputed issue of law or fact occupies the same degree of centrality to both the named plaintiffs' and class members' claims, then typicality is met. Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 293 (2d Cir. 1999) (citation omitted). [6]

> 6   Commonality and typicality "tend to merge into one another as both 'serve as guideposts for determining whether the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'" Freeland, 238 F.R.D. at 141 (quoting Caridad, 191 F.3d at 291).

Plaintiffs claim that [*15]    Defendant, acting through its Administrative Manager, maintained a practice and policy to discriminate against black employees, and that this policy had a discriminatory effect on black employees in overtime, promotions, discipline, and termination, and in creating a hostile work environment. "But the allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified." Falcon, 457 U.S. at 157. Indeed, there is a "wide gap" between an individual's claim that he is the victim of a discriminatory practice, and "the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims." Id. at 157-58. To bridge that gap, the plaintiff "must prove much more than the validity of his own claim." Id. at 158.

To prove more than the validity of their own claim, Plaintiffs must show that Defendant's alleged discriminatory practice "is causally related to [*16]  a pattern of disparate treatment or has a disparate impact on African-American employees of [Defendant's]." Caridad, 191 F.3d at 292. And where it is difficult to review the decision-making process because it involves subjective assessments by the decision-makers--here, the Administrative Manager--"significant statistical disparities are relevant to determining whether the challenged employment practice has a class-wide impact." Id. (citation omitted). Accordingly, in discrimination cases such as this, courts typically find commonality when the plaintiffs provide evidence demonstrating that being a member of a protected class has a statistically significant effect on the employment practice at issue. [7]

> 7   See, e.g., id. at 293 (finding commonality because "[t]he Class Plaintiffs submitted evidence that tends to establish that being Black has a statistically significant effect on an employee's likelihood of promotion"); Wright v. Stern, No. 01 Civ. 4437, 2003 U.S. Dist. LEXIS 11589, 2003 WL 21543539, *6 (S.D.N.Y. July 9, 2003) (finding that the commonality requirement was met where "plaintiffs' statistics demonstrate[d] common questions of fact because they tend[ed] to show that being African-American or Hispanic had an effect on an employee's promotion, compensation, and geographic assignment"); Latino Officers Ass'n City of New York v. City of New York, 209 F.R.D. 79, 89 (S.D.N.Y. 2003) (commonality was satisfied because "[t]he statistics submitted by plaintiffs . . . [were] sufficient to demonstrate common questions of fact because it tends to establish that being Latino or African-American [had] an effect on an officer's involvement and treatment in the NYPD's disciplinary system"); see also Jones v. Ford Motor Credit Co., No. 00 Civ. 8330, 2005 U.S. Dist. LEXIS 5381, 2005 WL 743213, *10 (S.D.N.Y. March 31, 2005) (finding that commonality was satisfied because plaintiffs "submitted evidence 'tend[ing] to establish' that being African-American ha[d] a statistically significant--and negative--effect on the terms of their financing agreements with FMCC") (quoting Caridad, 191 F.3d at 293).

[*17]   In this case, Plaintiffs' evidence falls short. Defendant's alleged discriminatory practices had the greatest impact, according to Plaintiffs' own allegations, on terminations. But as already noted, Plaintiffs' own expert found no evidence of discrimination in Defendant's termination practices. Moreover, even assuming that the Court accepted as true Plaintiffs' expert's opinion that there is statistical evidence of discrimination in hiring, [8] it would still be insufficient. Plaintiffs do not assert a claim for hiring discrimination, and the proposed class is limited to black and dark-skinned employees "who were either terminated, passed over for promotion, subject to discipline, harassed and/or retaliated against." Compl. P 14.

> 8   To calculate the hiring rates, Plaintiffs' expert simply divided the total number of black or Hispanic employees at Defendant's other sites by the actual number of black or Hispanic employees hired in a given month. Mazur Report at 9. Defendant's expert, however, opined that Plaintiffs' expert's methodology for calculating hiring rates

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 28 of 38

2007 U.S. Dist. LEXIS 18397, *; 100 Fair Empl. Prac. Cas. (BNA) 1139

was flawed and his conclusions unreliable. Ali Saad Expert Report (Saad Report) at 1 (Affidavit of Jane B. Jacobs ("Jacobs Aff.") Ex. 5). Instead, Defendant's expert believed that "the best benchmark for comparing the hires at 2 Broadway would be the actual qualified applicant pool for the available positions at 2 Broadway." Id. at 7. Incidently, Plaintiffs' expert agrees. Mazur Report at 9. But this data was not available, so Defendant's expert relied on the "relevant labor market" data--*i.e.,* the market from which it is likely that Defendant would have gotten applicants--which Defendant's expert described as the "most common approach in statistical analysis of employment discrimination allegations" when applicant-pool data is unavailable. Saad Report at 7-8. This data is "readily available from the United States Census." Id. at 8.

Using this data, Defendant's expert compared the percentage of black security guards actually hired at 2 Broadway with the percentage of blacks in the external labor market of qualified security guards in New York City. The results revealed that, during the Administrative Manager's tenure at 2 Broadway, 51.29% of the total number of security guards hired by Defendant were black, while the percentage of blacks in the external labor market was 52.64%. Thus, Defendant's expert concluded, "there is no statistically significant difference between the proportion of blacks in the external labor market and among Defendant's actual hires during [the Administrative Manager's] tenure at 2 Broadway." Id. at 13.

Therefore, the accuracy of Plaintiffs' expert's evidence of hiring rates at 2 Broadway is questionable. And while the Court may weigh this conflicting evidence and make a factual determination that there is or is not evidence of hiring discrimination on a class-wide basis, In re Initial Public Offering Sec. Lit., 471 F.3d at 41-42, such a determination is not necessary; Plaintiffs' statistical evidence of discrimination in hiring is not relevant to whether there was class-wide discrimination in promotions, overtime, discipline, and terminations.

[*18] Therefore, Plaintiffs' statistical evidence fails to demonstrate class-wide discrimination because it does not tend to show that being black (or dark-skinned) had an effect on an employee's promotion, overtime, discipline, or termination.

"[A] statistical showing is not the only way to establish the existence of an aggrieved class." Attenborough, 238 F.R.D. at 96. Courts have discretion to rely on anec-

dotal evidence when, as here, the statistical evidence is weak. Hnot, 228 F.R.D. at 484. Here, in support of their motion for class certification, Plaintiffs submitted four affidavits--their own, as well as affidavits from two other employees--which purport to detail the discriminatory practices of Defendant and the Administrative Manager. See Locke Aff. Ex. D (Affidavit of Duval Johnson ("Johnson Aff.")), Ex. G (W. Harris Aff.), & Ex. H (J. Harris Aff.); Allen Aff. Yet these self-serving affidavits contain little in the way of factual evidence. They are insufficient to bridge the wide gap between Plaintiffs' own allegations that they were subjected to discrimination and the existence of a class of black employees who have suffered the same alleged [*19] injury as Plaintiffs. Falcon, 457 U.S. at 157-58.

### 3. Adequacy

The final prerequisite for class certification under Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." This requires that "the proposed class representative . . . have an interest in vigorously pursuing the claims of the class, and . . . have no interests antagonistic to the interests of other class members." Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006) (citations omitted). [9] In addition, the court should assess the class representatives' credibility and trustworthiness, see, e.g., Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998), and whether they have sufficient knowledge of and involvement in the case so that they are able and willing to protect interests of class against possible competing interests of attorneys. Baffa, 222 F.3d at 61.

> 9  Plaintiffs' attorneys must also be "qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Securities Corp., 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted). This inquiry, however, while once part of Rule 23(a)(4)'s adequacy requirement, is now evaluated under Rule 23(g). Fed. R. Civ. P. 23(g); Attenborough, 238 F.R.D. at 100. Defendant's do not dispute that Plaintiffs' counsel are qualified, experienced, and able to conduct this litigation.

[*20] Defendant's argue that Plaintiffs cannot adequately represent the proposed class because they held supervisory positions with Defendant and, therefore, have interests that conflict with other class members whom Plaintiffs might have disciplined themselves. But the allegations are that it was the Administrative Manager who implemented and perpetrated the discriminatory policies, and that Plaintiffs themselves were victims of that discrimination. And "[i]f supervisory employees and supervisees are all subject to discrimination, all have an equal interest in remedying the discrimination." Hnot,

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 29 of 38

2007 U.S. Dist. LEXIS 18397, *; 100 Fair Empl. Prac. Cas. (BNA) 1139

228 F.R.D. at 486. Therefore, Plaintiffs' supervisory positions do not prevent them from adequately representing the proposed class. Id., see also, Kuck v. Berkey Photo, Inc., 81 F.R.D. 736, 740 (S.D.N.Y. 1979) (holding that plaintiffs' status as supervisory employees did not prevent them from making adequate class representatives because they themselves claimed to have been injured by defendant's alleged discriminatory practices).

But the inquiry doesn't end there. Commonality and typicality also "tend to merge with the adequacy-of-representation requirement" [*21] because they "serve as guideposts for determining whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Falcon, 457 U.S. at 157 n.13; Attenborough, 238 F.R.D. at 101. As discussed above, however, there is no evidence that Plaintiffs' claims are common to or typical of a larger class of black security guards. As such, Plaintiffs' cannot be counted on to adequately protect other potential class members who might have claims that differ from Plaintiffs. See, e.g., id. Moreover, Plaintiffs are no longer employed by Defendant and would thus not benefit from any sort of injunctive relief. Their interest in receiving back-pay, compensatory, and punitive damages might prevent them from adequately protecting the interests of those class members who are still employed by Defendant and who might be more inclined to receive injunctive, rather than monetary relief. See, e.g., Rehwaldt v. Elec. Data Sys. Corp., No. 95-CV-876A, 2005 U.S. Dist. LEXIS 44849, 2005 WL 1130480, *3 (W.D.N.Y. April 13, 2005) (finding that plaintiff would not be an adequate [*22] class representative given that, as a former employee, she had no interest in injunctive relief).

### B. The Rule 23(b) Requirements

Plaintiffs assert that their class action can be maintained under either Rule 23(b)(2) because Defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." They also assert reliance on Rule 23(b)(3), because "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Pl. Memo at 20, 23; Fed. R. Civ. P. 23(b)(2) & (3).

### 1. Rule 23(b)(2)

A class action is appropriately maintained under Rule 23(b)(2) if the defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a

whole." Fed. R. Civ. P. 23(b)(2). When, as here, plaintiffs seek both injunctive and monetary relief, the court, [*23] in its discretion, must determine that the injunctive relief sought predominates over any compensatory and punitive relief in order for the case to proceed under this section. Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 164 (2d Cir. 2001). In so determining, the court must satisfy itself that: "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." Id. (citation omitted).

Injunctive relief does not predominate over Plaintiffs' claims for compensatory and punitive damages. Plaintiffs seek an injunction enjoining Defendant from discriminating against Plaintiffs and others similarly situated, but they also pray for $ 20,000,000.00 in compensatory and punitive damages--that's nearly $ 690,000 each for the 29 black employees that Plaintiffs allege are victims of Defendant's discriminatory policies. In addition, Plaintiffs state in their affidavits that as a result of their terminations, they have suffered, [*24] and continue to suffer, extreme mental distress and humiliation. Mere injunctive relief would not compensate Plaintiffs for that mental distress and humiliation. In fact, Plaintiffs both expressed no desire to be reinstated. See W. Harris Dep. at 92-93; J. Harris Dep. at 69-70. Finally, as Plaintiffs no longer work for Defendant and do not seek or want reinstatement, they would not benefit from any injunctive relief that this Court might award, another indication that Plaintiffs' primary interest is individual monetary compensation. See, e.g., Rehwaldt, 2005 U.S. Dist. LEXIS 44849, 2005 WL 1130480 at *2 (finding that class certification was inappropriate because many of the proposed class members no longer worked for the defendant employer, indicating that monetary damages predominated); Morgan v. Metropolitan District Comm., 222 F.R.D. 220, 235 (D.Conn. 2004) (holding that class certification was inappropriate under Rule 23(b)(2) because the proposed class contemplated former employees, and noting that "it is difficult to see how these former employees could meaningfully benefit from the declaratory relief Plaintiffs seek").

Therefore, because Plaintiffs request for compensatory [*25] and punitive damages predominate the total relief sought, class certification is not appropriate under Rule 23(b)(2).

### 2. Rule 23(b)(3)

Class certification under Rule 23(b)(3) is appropriate if "the court finds that the questions of law or fact common to the members of the class predominate over any

Case 1:07-cv-06996    Document 15-2    Filed 02/07/2008    Page 30 of 38

2007 U.S. Dist. LEXIS 18397, *; 100 Fair Empl. Prac. Cas. (BNA) 1139

questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). As already determined, however, there are no questions of law or fact common to the members of the proposed class so that a class action would be superior to Plaintiffs adjudicating their claims individually. At best, Plaintiffs have individual claims for discriminatory termination. They seek to represent a class of other plaintiffs who might also have claims for discrimination in promotions, overtime assignments, and discipline. Each individual claim would have its own provable set of facts and measure of damages. Therefore, class certification would be inappropriate. See, e.g., Barabin v. Aramark Corp., 210 F.R.D. 152, 162 (E.D.Pa. 2002) (denying class certification under [*26] Rule 23(b)(3), even though plaintiffs all alleged that they were "subjected to frequent harassment and unjustified disciplinary sanctions by Caucasian supervisors not imposed on similarly situated Caucasian employees," because "the circumstances under which those acts of discrimination were committed and the resultant injuries are unique to each individual plaintiff," and "individual claims for damages would therefore require individualized evaluations and findings of the facts and defenses").

## CONCLUSION

Plaintiffs cannot satisfy all the requirements for class certification found in Rule 23(a) because there are no questions of law or fact common to the class, and Plaintiffs' claims are not typical of other class members' claims. Nor would Plaintiffs be adequate representatives of the proposed class even if commonality and typicality could be satisfied. Assuming Plaintiffs could meet all the Rule 23(a) requirements, class certification would not be appropriate under Rule 23(b)(2) because monetary, not injunctive, relief predominates Plaintiffs' claims. Also, under Rule 23(b)(3), a class action would not be superior to Plaintiffs bringing individual suits for employment discrimination.

[*27]    The motion for class certification is DENIED.

Dated: New York, New York

March 7, 2007

SO ORDERED

GEORGE B. DANIELS

United States District Judge

LEXSEE



Positive
As of: Feb 06, 2008

PATRICE SIENKO, Plaintiff, v. VILLAGE OF WOODRIDGE, STEVEN LIST,
GEOFFREY KOROUS, LEN NOTZ, LORRAINE KERN, TAMMIE LINDBLOM,
WILLIAM MURPHY, JOHN PERRY, and KATHLEEN RUSH, Defendant.

96 C 1429

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

1996 U.S. Dist. LEXIS 9825

July 11, 1996, Decided
July 12, 1996, DOCKETED

**DISPOSITION:**    [*1]  Woodridge's motion to dismiss
the portion of Count I which alleges sexual harassment
granted. Defendants' motions to dismiss Counts II and III
denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a former police
department employee, filed a three count complaint
against defendants, a village, its mayor, and numerous
police department employees, alleging sex discrimina-
tion in her employment. Defendants filed a motion for a
more definite statement pursuant to Fed. R. Civ. P. 12(e)
and motions to dismiss pursuant to Fed. R. Civ. P.
12(b)(6).

**OVERVIEW:** The employee's first count alleged in part
sexual harassment based on a hostile work environment
in violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C.S. § 2000e et seq. The remaining counts al-
leged that defendants deprived the employee of her
Fourteenth Amendment right to equal protection pursu-
ant to 42 U.S.C.S. § 1983. The employee alleged specific
types of differential treatment she received at the hands
of defendants in their official and individual capacities,
disparate criticism and supervision, different treatment
than males for similar mistakes, discriminatory treatment
in the scheduling of her working hours, unequal compen-
sation, and reports of discriminatory treatment to super-
visors which were ignored and left uncorrected. The

court granted in part and denied in part defendants' mo-
tions. First, the court held that the employee's hostile
work environment claim failed because it was unsup-
ported by sufficient factual allegations. Second, the court
held that the employee's § 1983 claims survived, albeit
barely, because the employee's complaint alleged facts
that allowed the court and defendants to understand the
complaint against them.

**OUTCOME:** The court granted defendants' motion to
dismiss the portion of the employee's complaint that al-
leged sexual harassment. The court denied defendants'
motions to dismiss the remaining counts alleging civil
rights violations.

**CORE TERMS:** hostile, work environment, sexual har-
assment, harassment, withstand, sexual harassment,
pleading requirements, discriminatory, municipality,
supervisor, custom, sex, sex discrimination, discrimina-
tory treatment, actionable, severe, sexual, notice, dispa-
rate treatment, setting forth, individual capacities, work-
ing environment, hypothetically, supervision, experi-
enced, scheduling, heightened, subjected, disparate, per-
vasive

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims*

*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
*Criminal Law & Procedure > Accusatory Instruments > General Overview*

[HN1]Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted since, in ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. The allegations of a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Severe & Pervasive Standards*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*

[HN2]Title VII of the Civil Rights Act of 1964 (Title VII) is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The question of whether an environment is hostile can only be answered by considering all of the circumstances. The following non-exclusive list circumstances should be considered: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Employee Burdens*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Objective & Subjective Standards*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Severe & Pervasive Standards*

[HN3]To establish a prima facie case for hostile work environment sexual harassment, the plaintiff must show: (1) that he was a member of a protected class; (2) that he was subjected to unwelcome verbal or physical conduct of a sexual nature; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment; and (5) that the employer knew or should have known of the harassment and unreasonably failed to take appropriate corrective action. The fourth element of the prima facie case is evaluated from both an objective and a subjective perspective. Title VII of the Civil Rights Act of 1964 (Title VII) does not make all forms of harassment actionable. The "sexual harassment" that is actionable under Title VII is the exploitation of a powerful position to impose sexual demands or pressures on an unwilling but less powerful person. Actionable sexual harassment fosters a sense of degradation in the victim by attacking their sexuality. In effect, the offender is saying by words or actions that the victim is inferior because of the victim's sex.

*Civil Rights Law > Immunity From Liability > Respondeat Superior Distinguished*
*Governments > Local Governments > Claims By & Against*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*

[HN4]Under 42 U.S.C.S. § 1983, a municipality cannot be liable solely on the basis of respondeat superior; a municipality is liable only where the employee acted pursuant to a municipal policy or custom. Allegations of a pattern or a series of incidents of unconstitutional conduct are sufficient to state an unwritten municipal policy. Moreover, a single act of a sufficiently high-ranking policy-maker is sufficient to establish an entity's policy or custom. An entity may be liable even for informal actions, if they reflect a general policy, custom, or pattern of official conduct which even tacitly, encourages conduct depriving citizens of their constitutionally protected rights. In order to plead a § 1983 action against persons named in their individual capacities, a plaintiff must allege that, as to non-policymaker defendants, she was deprived of a federally protected right by an individual acting under the color of state law. Where she is advancing a claim against policymakers, the question of liability rests upon the particular action or inaction that forms the predicate of a claimed constitutional violation.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Criminal Law & Procedure > Accusatory Instruments > Complaints*
*Governments > Local Governments > Claims By & Against*

[HN5]A complaint raising a civil rights claim against a municipality does not require pleadings more stringent that the usual notice pleading requirements of Fed. R. Civ. P. 8(a). Although claimants are not to be held to a heightened pleading requirement, clearly they are still held to the basic "notice pleading" requirements of the Federal Rules of Civil Procedure. Under the Federal Rules of Civil Procedure, a claimant must set forth "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. The complaint must, at the very least, allege facts which allow the court and defendants to understand the complaint against them.

COUNSEL: For PATRICE SIENKO, plaintiff: Richard Benson Rogich, Timothy M. Richardson, Spyro J. Demakis, Richard B. Rogich & Associates, Ltd., Chicago, IL.

For VILLAGE OF WOODRIDGE, defendant: Patricia L. Argentati, Norton & Mancini, Wheaton, IL.

For STEVEN LIST, defendant: Patricia L. Argentati, (See above).

For GEOFFREY KOROUS, defendant: Patricia L. Argentati, (See above).

For LEN NOTZ, defendant: Patricia L. Argentati, (See above).

For LORRAINE KERN, defendant: Patricia L. Argentati, (See above).

For TAMMY LINDBLOOM, defendant: Patricia L. Argentati, (See above).

For WILLIAM MURPHY, defendant: Patricia L. Argentati, (See above).

For JOHN PERRY, defendant: Patricia L. Argentati, (See above).

For KATHLEEN RUSH, defendant: Patricia L. Argentati, (See above).

JUDGES: Charles P. Kocoras, United States District Judge

OPINION BY: Charles P. Kocoras

OPINION

MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter is before the Court on the defendants' motion for a more definite statement [*2] pursuant to Rule 12(e) and motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the defendants' motions are granted in part and denied in part.

BACKGROUND

The plaintiff, Patrice Sienko ("Sienko"), filed a three count complaint against defendants, Village of Woodridge ("Woodridge"), its Mayor, and numerous employees of the Woodridge Police Department ("WPD") for sex discrimination in her employment. Sienko held a position with the WPD as a communications supervisor from April of 1990 through approximately October 26, 1993 when she constructively resigned her position. She then served as a telecommunications officer with the WPD from November of 1993 until she was constructively discharged on July 28, 1994.

Sienko claims that from April of 1992 to July of 1994 she was regularly subjected to discriminatory treatment relating to her sex. She alleges that during the course of her employment with the WPD, there were no female supervisors or superiors for police officers in the chain of command for the WPD. Sienko also alleges that while she worked as a communications supervisor, she received differential treatment and received [*3] disparate criticism and/or supervision over her work from defendants, Steven List ("List"), the Chief of Police for the WPD, and Geoffrey Korous ("Korous"), the Deputy Chief of Operations. Moreover, she claims that males were treated differently than her for similar mistakes, given preferential treatment in the scheduling of their hours, and received unequal compensation (in comparison with females) for the same or similar work. Sienko claims that she made repeated requests and complaints regarding this conduct to List and Korous, in addition to the Mayor of Woodridge, William Murphy ("Murphy"), and to Woodridge's acting Administrator, John Perry ("Perry"). However, nothing was done to remedy the situation according to the Complaint, the well-pleaded facts of which we must currently accept as true..

During the course of her employment as a telecommunicator, Sienko was supervised by Korous and Len Notz ("Notz"). She alleges that until the time of her constructive discharge on July 28, 1994, she also received disparate criticism and/or supervision from these defendants. She once again alleges that her male counterparts in telecommunications were treated differently than her for similar [*4] mistakes, and that they received preferential treatment in the scheduling of their hours. She claims that while she held this position, she experienced further harassment and discriminatory treatment from defendants, List, and his close acquaintances, Tammy

Lindbloom ("Lindbloom") and Lorraine Kern ("Kern"). In addition, she claims that she reported this behavior to Murphy and Perry, as well as Kathleen Rush ("Rush"), the Assistant Administrator or Personnel Director for the Village of Woodridge, but that they, as well as Sienko's supervisors in the WPD, were deliberately indifferent to her discriminatory treatment and failed to take remedial action.

Sienko alleges that the discrimination and harassment she experienced were sufficiently severe and persistent over a period of time to seriously affect her mental well-being, resulting first in her constructive resignation, and then her subsequent constructive discharge from the defendant's employment. On May 3, 1995, she filed a charge of discrimination in the workplace against the defendants with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights.

After receiving her right to sue letter [*5] from the EEOC, Sienko filed this suit in federal court. In Count I, the plaintiff alleges that Woodridge's actions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., in that she received disparate treatment in the terms and conditions of her employment, and that she experienced sexual harassment based upon a hostile work environment. In Counts II and III respectively, the plaintiff alleges that the defendants Woodridge, and the Mayor and various police employees individually, deprived her of her Fourteenth Amendment right to equal protection pursuant to 42 U.S.C. § 1983. Defendant Woodridge now moves for a more definite statement with respect to Count I, or in the alternative to dismiss the portion of Count I which alleges a sexually hostile work environment. Additionally, the defendants seek the entire dismissal of Counts II and III.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. [HN1]Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted since, in ruling [*6] on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. Ed Miniat, Inc. v. Globe Life Ins. Group Inc., 805 F.2d 732, 733 (7th Cir. 1986), cert. denied, 482 U.S. 915, 96 L. Ed. 2d 676, 107 S. Ct. 3188 (1987). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99

(1957). See also Hishon v. King & Spalding, 467 U.S. 69, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); Doe on Behalf of Doe v. St. Joseph's Hospital, 788 F.2d 411 (7th Cir. 1986). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. Gray v. County of Dane, 854 F.2d 179, 182 (7th Cir. 1988). We turn to the motion before us with these principles in mind.

## DISCUSSION

### COUNT I

In Count I of the Complaint, the [*7] plaintiff alleges that Woodridge, through its agents, violated Title VII of the Civil Rights Act of 1964. Title VII makes it compensation, terms, conditions, or privileges of employment because of such individual's...sex..." 42 U.S.C. § 2000e-2(a)(1). Title VII is designed to protect workers from sex discrimination which may manifest itself in disparate treatment in the terms and conditions of one's employment because of one's gender or in sexual harassment that produces a discriminatorily hostile work environment. Harris v. Forklift Sys., 126 L. Ed. 2d 295, 114 S. Ct. 367, 370 (U.S. 1993).

In Count I of her Complaint, Sienko alleges both of these grounds for recovery against Woodridge. The defendant, Woodridge, has filed a motion for a more definite statement, arguing that Rule 8(e)(2) of the Federal Rules of Civil Procedure allows a plaintiff to set forth two or more claims within the same count only if the counts are set forth alternatively or hypothetical. Alternatively, the defendant seeks to dismiss the portion of the complaint which alleges sexual harassment. Because the parties have briefed the issue of the duality of Count I, we will treat the issue even though our [*8] holding as to the insufficiency of the sexual harassment claims renders the discussion an academic exercise.

Woodridge contends that because the plaintiff has stated her claims for disparate treatment and sexual harassment conjunctively, rather than alternately or hypothetically, she has set forth a confusing, ambiguous pleading which thereby prevents the defendant from framing its response. We are not convinced by this argument. While it is true that Rule 8(e)(2) affords the option to plead alternatively argument. While it is true that Rule 8(e)(2) affords the option to plead alternatively of hypothetically, nowhere in the text of this rule is there a prohibition against multiple statements of a claim being plead conjunctively in the same count. Moreover, Woodridge has failed to cite any authority in support of this contention. Further, the complaint is not "so vague or ambiguous" that it fails sufficiently to notify the defendant of the sex discrimination claims against it, or pre-

vents the defendant from framing a response. Because we find that Count I adequately conforms with Rule 8(e), there is no need for the plaintiff to file an amended complaint setting forth the two theories [*9] in separate sections.

However, Woodridge also requests that we dismiss the portion of Count I which alleges a sexually hostile work environment. The defendant claims that the facts alleged in the complaint are not sufficient to set forth a cause of action for sexual harassment. We agree. The United States Supreme Court considered the definition of hostile work environment in Harris, 126 L. Ed. 2d 295, 114 S. Ct. 367. In Harris, the Court reiterated that [HN2]Title VII was violated "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" 114 S. Ct. at 370 (quoting Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986)). The Court characterized this standard as a "middle path" between requiring a plaintiff to prove psychological injury and making actionable conduct that is merely offensive but does not pervade the working environment. Id. The Court stated that the question of whether an environment is hostile can only be answered by considering all of the circumstances. [*10] Id. at 371. The Court set forth the following non-exclusive list circumstances to be considered: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.

[HN3]To establish a prima facie case for hostile work environment sexual harassment, the plaintiff must show: (1) that he was a member of a protected class; (2) that he was subjected to unwelcome verbal or physical conduct of a sexual nature; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment; and (5) that the employer knew or should have known of the harassment and unreasonably failed to take appropriate corrective action. Swanson v. Elmhurst Chrysler Plymouth, Inc., 882 F.2d 1235, 1238 (7th Cir. 1989) (setting forth the first four elements), cert. denied, 493 U.S. 1036, 107 L. Ed. 2d 774, 110 S. Ct. 758 (1990); Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir. 1990) (providing this formulation of the fifth element). The fourth element [*11] of the prima facie case is evaluated from both an objective and a subjective perspective. Rennie v. Dalton, 3 F.3d 1100, 1107 (7th Cir. 1993). Title VII does not make all forms of harassment actionable:

> The "sexual harassment" that is actionable under Title VII is "the exploitation of a powerful position to impose sexual demands or pressures on an unwilling but less powerful person." Actionable sexual harassment fosters a sense of degradation in the victim by attacking their sexuality. In effect, the offender is saying by words or actions that the victim is inferior because of the victim's sex.

Goluszek v. Smith, 697 F. Supp. 1452, 1456 (N.D. Ill. 1988)(quoting Note, Sexual Harassment Claims of Abusive Work Environment Under Title VII, 97 Harv. L. Rev. 1449, 1451-55 (1984)).

In the instant case, Sienko's hostile work environment claim cannot stand because it is unsupported by sufficient factual allegations. Aside from the general allegation that she was subjected to "unwelcome conduct of a sexual and gender based nature," she has provided no other factual allegations in support of her claim of harassment. Nowhere in the Complaint does she allege any specific [*12] incidents in which sexual demands, pressures or innuendo were imposed upon her. Further, at no time does she allege that she was physically or verbally threatened or humiliated on the basis of her sex. Moreover, Sienko does not adequately allege that her treatment was so sufficiently severe or pervasive as to create an objectively abusive working environment as it was defined by the Supreme Court in Harris. She has not alleged any instances wherein she was discriminatorily intimidated, ridiculed or insulted. 114 S. Ct. at 370. Having set forth no facts under which her claim for hostile work environment sexual harassment can be sustained, this portion of Count I must be dismissed.

## COUNTS II AND III

The plaintiff has brought Counts II and III pursuant to 42 U.S.C. § 1983. In Count II, the plaintiff alleges that the Village of Woodridge is liable, through its agents and policymakers, for maintaining a custom of sex discrimination with respect to the employment of women in the WPD, which resulted in purposeful discrimination against her because of her gender and a violation of her Fourteenth Amendment right to equal protection under the law. In Count III, the plaintiff seeks [*13] to hold the various defendants employed by Woodridge liable in their individual capacities.

[HN4]Under § 1983, a municipality cannot be liable solely on the basis of respondeat superior; a municipality is liable only where the employee acted pursuant to a municipal policy or custom. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690-91, 56 L. Ed.

2d 611, 98 S. Ct. 2018 (1978). Courts have found allegations of a pattern or a series of incidents of unconstitutional conduct to be sufficient to state an unwritten municipal policy. Powe v. City of Chicago, 664 F.2d 639, 650 (7th Cir. 1981). Moreover, a single act of a sufficiently high-ranking policy-maker is sufficient to establish an entity's policy or custom. Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S. Ct. 1292, 1298, 89 L. Ed. 2d 452 (1986); Malak v. Associated Physicians, Inc., 784 F.2d 277, 283-4 (7th Cir. 1986). An entity may be liable even for "informal actions, if they reflect a general policy, custom, or pattern of official conduct which even tacitly, encourages conduct depriving citizens of their constitutionally protected rights." Wolf-Lillie v. Sonquist, 699 F.2d 864, 870 (7th Cir. [*14] 1983).

In order to plead a § 1983 action against persons named in their individual capacities, a plaintiff must allege that, as to non-policymaker defendants, she was deprived of a federally protected right by an individual acting under the color of state law. Alvarado v. City of Chicago, et al., 648 F. Supp. 994, 996 (N.D. Ill. 1986). Where she is advancing a claim against policymakers, the question of liability rests upon the particular action or inaction that forms the predicate of a claimed constitutional violation.

The defendants have moved to dismiss both counts, arguing that the plaintiff has failed to substantiate her claims with sufficient factual support. Essentially, the defendants assert that the plaintiff's § 1983 claims must be dismissed because she has not alleged a "specific pattern of series of incidents" evidencing either a discriminatory policy or custom, or a discriminatory intent on the part of the municipality or the individual defendants. After examining the complaint thoroughly, as well as the controlling case law, we believe that the complaint is sufficient to withstand this motion to dismiss, although barely so.

In recent years, the U.S. Supreme Court [*15] has addressed the pleading requirements for plaintiffs suing municipalities for civil rights violations. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 1163, 122 L. Ed. 2d 517 (1993). The Court, in Leatherman, held that [HN5]a complaint raising a civil rights claim against a municipality does not require pleadings more stringent that the usual notice pleading requirements of Federal Rule of Civil Procedure 8(a). 113 S. Ct. at 1163. Although Leatherman holds that claimants are not to be held to a heightened pleading requirement, clearly they are still held to the basic federal rules' "notice pleading" requirements. Under the federal rules, a claimant must set forth "'a short and plain statement of the claim' that will give the defendant fair notice of what the Plaintiff's claim is

and the grounds upon which it rests." Conley, 355 U.S. at 47.

District Courts in the Seventh Circuit have been divided as to whether or not mere conclusory allegations are sufficient to withstand a motion to dismiss alleging violations of § 1983. See Silk v. City of Chicago, 1996 U.S. Dist. LEXIS 8334, 1996 WL 312074, 23 (N.D. Ill. 1996). Actually, the Seventh Circuit [*16] itself has vacillated as to whether any facts at all must be plead in a complaint alleging a violation of § 1983 in order to withstand a motion to dismiss. For instance, in McTigue v. City of Chicago, 60 F.3d 381 (7th Cir. 1995) the Seventh Circuit affirmed the dismissal of a complaint because it "failed to include a factual basis to describe with particularity the bias that the plaintiff alleges". McTigue, 60 F.3d at 382. However, in Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995), the Seventh Circuit again rejected a heightened pleading requirement and held that conclusory allegations were sufficient to withstand a motion to dismiss. The Court definitively stated:

> But apart from the rule itself and a handful of tiny arguably appropriate judicial supplements to it, a plaintiff in a suit in federal court need not plead facts; he can plead conclusions. See Fed. R. Civ. P. 8(a)(2). We have made this point many times in our own cases. We know it applies to this case, because that is the holding of Leatherman.

Id. at 153. Nevertheless, in Doherty v. City of Chicago, 75 F.3d 318 (7th Cir. 1996), the Seventh Circuit stated that although there is [*17] no heightened pleading standard for § 1983 cases, there still must be sufficient facts plead to allow the court and the defendants to understand the gravamen of the complaint. Id. at 326. Our view of the appropriate standard is closest to that expressed in Doherty; the complaint must, at the very least, allege facts which allow the court and defendants to understand the complaint against them.

With these principles in mind, we turn to the § 1983 claims advanced by the plaintiff in this case. In support of Counts II and III, Sienko has alleged the specific types of differential treatment she has received at the hands of the various defendants in their official and individual capacities: disparate criticism and supervision; different treatment than males for similar mistakes; discriminatory treatment in the scheduling of her working hours; unequal compensation; and reports of discriminatory treatment to supervisors which were ignored and left uncorrected. Because we believe that these claims sufficiently sets forth facts and allegations to put the defendants on

notice of the claims against them, as well as to under-
stand the gravamen of the complaint, Counts II and III
are [*18] sufficient to withstand this motion to dismiss.
Thus, the defendants' motions to dismiss Counts II and
III are denied.

**CONCLUSION**

For all of the above reasons, Woodridge's motion to
dismiss the portion of Count I which alleges sexual har-
assment is granted. The defendants' motions to dismiss
Counts II and III are denied.

Charles P. Kocoras

United States District Judge

Dated: July 11, 1996