# EXHIBIT 7

Page 77

1  A  Yes.
2  Q  -- your schedule changed to nights.
3  A  Yes.
4  Q  And that's when you worked more with
5  Marvin --
6  A  Yes.
7  Q  -- and not with Tiffany.
8  A  Yes.
9  Q  Okay. So I've read your EEOC charge and
10 your complaint in this case, or the complaint EEOC
11 filed on your behalf, and I understand that you claim
12 that you were discriminated against or harassed
13 because of your skin color during your employment
14 with Family Dollar. Is that correct?
15 A  Yes.
16 Q  Who harassed you because of your color?
17 A  Tiffany Bates.
18 Q  And it was only Ms. Bates that you're
19 claiming harassed you, correct?
20 A  Yes, due to color. I said due to color.
21 Q  Right.
22    MS. GAUR: Is this 3? So can we do this as
23 3A and 3B?
24 ///

Page 78

1         (Cotton Exhibits 3A and 3B
2          marked.)
3    MR. WALDRON: She would like to take a
4  break to go to the restroom.
5    MS. GAUR: Sure.
6    THE VIDEOGRAPHER: We're going off the
7  record at 11:25.
8         (Recess taken.)
9         (Enter Ms. Asilia Backus.)
10   THE VIDEOGRAPHER: We're back on the record
11 at 11:30.
12 BY MS. GAUR:
13 Q  Ms. Cotton, you've been handed two
14 exhibits, which we've marked as Exhibits 3A and 3B to
15 your deposition. Can you review those exhibits and
16 let me know when you've finished?
17 A  All right.
18 Q  You've completed reviewing them?
19 A  Mm-hmm.
20 Q  And Exhibit 3A and 3B appear to be your
21 EEOC Charge of Discrimination. Is that correct?
22 A  Yes.
23 Q  And they look like the exact same Charge of
24 Discrimination, but the reason I'm showing them both

Page 79

1  to you is that it appears that the signatures on both
2  of them are different. Do you see that?
3  A  Mm-mmm. They look the same to me. The
4  signatures, you said?
5  Q  Yeah. Are the signatures, are they both
6  your signatures?
7  A  Yes.
8  Q  Did you sign two EEOC charges on March 31st
9  of 2006?
10 A  Yes.
11 Q  Do you recall why that was that you had to
12 sign two of them?
13 A  No. Maybe -- maybe she gave me two of the
14 same things. I don't know.
15 Q  When you say "she," who are you talking
16 about?
17 A  I'm talking about Carol Milazzo.
18 Q  And Ms. Milazzo was the EEOC investigator
19 assigned to your charge, correct?
20 A  Yes.
21 Q  Did you meet with Ms. Milazzo when you
22 filed your Charge of Discrimination?
23 A  Yes.
24 Q  So did you meet with Ms. Milazzo on

Page 80

1  March 31st of 2006?
2  A  Yes.
3  Q  Looking at Exhibit 3A --
4  A  Mm-hmm.
5  Q  -- your signature is in the bottom
6  left-hand corner of the document, correct?
7  A  Correct.
8  Q  And you signed this document on March 31st,
9  2006, correct?
10 A  Correct.
11 Q  And your signature indicates that you're
12 declaring under penalty of perjury that everything
13 that you've stated above is true and correct, right?
14 A  Correct.
15 Q  Okay. So let's look at your narrative in
16 your Charge of Discrimination. It indicates that
17 beginning on or around July 4th, 2005, and ongoing,
18 you were subjected to derogatory comments and threats
19 based on your color. Correct?
20 A  Correct.
21 Q  So the harassment, you believe, began on
22 July 4th, 2005?
23 A  Incorrect.
24 Q  That's incorrect?

Page 89

1 or around July 4th, 2005. So it's not just the date
2 that's wrong; it's when the harassment began that is
3 wrong, correct?
4     A    Correct.
5         MR. WALDRON: Wait a minute. I think she's
6 entitled to explain what she meant by dates.
7 BY MS. GAUR:
8     Q    Sure. You can explain it.
9     A    Well, when I originally gave counselor
10 Carol Milazzo notes, it states when everything
11 happened from beginning to end. You all have the
12 reports when I called the 1-800 complain number, when
13 all that began. And like I said, you all have the
14 correct dates when everything happened. And you
15 should also have the report number also.
16     Q    Sure.
17     A    That's what I mean about the dates.
18     Q    Sure. And I'm not talking about what I
19 have. I'm not talking about what documents I have.
20 I'm just talking about what your charge says.
21         Your charge that you submitted under
22 penalty of perjury, you're telling me your charge is
23 false -- right? -- because it's got information in
24 there that is inaccurate.

Page 90

1     A    Correct.
2     Q    You took your charge seriously -- right? --
3 when you submitted it with the EEOC?
4     A    Yes, I did.
5     Q    And did you read your amended charge before
6 you submitted it?
7     A    Like I said, I briefly went over it. I
8 really didn't take the time to even really think
9 about the dates.
10     Q    Was that not important to you at the time?
11     A    Yes, it was very important to me.
12     Q    Okay. It was important to you to be
13 accurate in what you were submitting to the EEOC, to
14 the federal government, right?
15     A    Correct.
16     Q    But now what you're telling me is you
17 didn't read it over all that closely, and it's
18 inaccurate.
19         MR. WALDRON: I'm going to object to "it's
20 inaccurate." We've been focusing on one particular
21 sentence. But you may answer.
22         THE WITNESS: Repeat the question again.
23 BY MS. GAUR:
24     Q    I said what you're telling me now is that

Page 91

1 you didn't read the charge over all that closely, and
2 it's inaccurate.
3     A    Correct.
4     Q    If I could ask you also on Exhibits 4A and
5 4B. In your signature block, it's dated March 31st
6 of 2006. Do you see that?
7     A    Correct.
8     Q    That's incorrect too, isn't it?
9     A    What's incorrect?
10     Q    The date in your signature block because if
11 you look at the stamp on both Exhibits 4A and 4B,
12 it's stamped received by the EEOC on May 1st of 2006.
13     A    I don't know if this -- I don't even
14 remember if these was papers sent to me to my home
15 and -- or if these are papers that I did inside EEOC.
16     Q    Mm-hmm.
17     A    Because it was so long ago.
18         So I don't know why it's a difference
19 between the dates and the stamps at this time.
20     Q    Did you meet with Ms. Milazzo when you
21 submitted your amended Charge of Discrimination?
22     A    Yes.
23     Q    Did you discuss with Ms. Milazzo the facts
24 that supported your amended Charge of Discrimination?

Page 92

1     A    Yes.
2     Q    Did you mention to Ms. Milazzo that
3 actually the harassment began before July 4th of
4 2005, so the charge should be changed?
5     A    Yes.
6     Q    You told Ms. Milazzo the charge needed to
7 be changed?
8     A    No, I -- no. No, no, no. I'm -- can you
9 repeat that question again?
10     Q    Sure. I said: Did you mention to
11 Ms. Milazzo that actually the harassment began before
12 July 4th of 2005, so the charge should be changed to
13 reflect that?
14     A    I -- I -- to be honest with you, I didn't
15 even really pay attention really to what the
16 documents had stated in the log about the dates.
17     Q    So you signed a document under penalty of
18 perjury that was being submitted to the federal
19 government without really paying attention to what it
20 stated? Is that your testimony?
21     A    Incorrect.
22     Q    Okay. Correct me. What is your testimony
23 then?
24     A    I'm just stating that I didn't go over --

Page 97

1  Q   How do you remember that it was two days
2  after that had happened?
3  A   I remember it because I had kept calling
4  Tom Hemmens, letting him know what had happened that
5  day in the store.
6      So in the beginning, I didn't write it
7  down. So it was like two days after. And my mom
8  said no, you should write that down because it's
9  taking him these many days to get back with you on
10 what had occurred.
11 Q   Okay.
12 A   So then two days later, that's when I
13 started writing the journals, which was May 27th.
14 Q   Okay. And it's my understanding too then
15 that you were writing --
16 A   Excuse me.
17 Q   I'm sorry.
18     You were writing down dates and occurrences
19 of things that you believed were important that were
20 happening at work. Is that right?
21 A   I was writing down everything that happened
22 that day.
23 Q   And you documented the events that you
24 thought were important, right?

Page 98

1  A   All of it was important to me, meaning I
2  wrote down everything.
3  Q   Sure. You wrote down the events that you
4  thought were important, right?
5  A   Yes.
6  Q   Okay. Now, we talked about -- I'm sorry.
7  I gave you Exhibits 5A and 5B.
8  A   Mm-hmm.
9  Q   And if you look at the two of them side by
10 side, they appear to be identical, except 5B has
11 additional notations on it. Do you see that? In the
12 left-hand margin it says, "Notes when things happen
13 at work."
14 A   Yes.
15 Q   And then in the May 27th entry, it notes
16 that Tom is -- is that "general manager"?
17 A   Yes.
18 Q   And the May 30th entry -- and then it talks
19 about the word -- the word "retaliation" is set there
20 at the top?
21 A   Yes.
22 Q   And then the May 31st entry, the word
23 "retaliation" is at the top.
24 A   Yes.

Page 99

1  Q   Also on the May 30th entry, it says --
2  after the first word, "Tiffany," "is a manager"?
3  A   Yes.
4  Q   Were those notes that I just read off put
5  on there at some later date?
6  A   No -- yes. It was just the first notes
7  were my notes that I was taking. And then as the
8  case -- as I started seeing Carol Milazzo, she wanted
9  to see notes that I had told her I had wrote.
10     So these -- these were the original notes
11 (indicating). And I was just --
12 Q   Can you refer to that by exhibit number?
13 I'm sorry. I don't mean to interrupt.
14 A   Exhibit No. --
15     MR. WALDRON: Read them off there.
16     THE WITNESS: Oh, okay. Exhibit No. 5A.
17 And I was just -- on Exhibit 5B, I was just letting
18 her know who was who and what was what.
19 BY MS. GAUR:
20 Q   Okay. So Exhibit 5A --
21 A   Mm-hmm.
22 Q   -- were your notes that you took as things
23 happened that you believed were important to you,
24 right?

Page 100

1  A   Correct.
2  Q   And Exhibit 5B are your same notes, but
3  with explanatory information on there for Ms. Milazzo
4  because she didn't know who these people were.
5  A   Exactly, yes.
6  Q   Okay. So let's look at Exhibit 5A. And I
7  want to start with the first entry on there, which is
8  May 27th of 2005.
9  A   Mm-hmm -- yes.
10 Q   And you appear to be -- and please correct
11 me if I'm misunderstanding the issue. But you appear
12 to be documenting an issue about a complaint you made
13 to Tom that Tiffany didn't know how to treat
14 employees and used profanity.
15 A   Yes.
16 Q   Is that correct?
17 A   Yes.
18 Q   Is there anything else documented in -- on
19 the May 27th entry? And you talk about Tom's
20 response, right?
21 A   Correct.
22 Q   So apart from --
23 A   And how long it took.
24 Q   I'm sorry?

Page 109

1 right?
2    A    Correct.
3    Q    At the end of the August 5th entry, which
4 is -- again, we're looking at Exhibit 5A, and it's
5 Document No. E00099. It talks about how you had a
6 conversation with Larry about this issue between you
7 and Marvin, right?
8    A    Correct.
9    Q    Am I correct that there are no other
10 complaints to Larry --
11    A    Incorrect.
12    Q    -- within Exhibit 5A?
13    A    Incorrect.
14    Q    Okay. Where is the other complaint to
15 Larry within Exhibit 5A?
16    A    I had called Tom -- oh, you said with
17 Larry?
18    Q    Yes.
19    A    I had called him and complained to -- no, I
20 called Tom Hemmens and complained to him about how
21 Tiffany was talking to us. And, you know --
22    Q    Right.
23    A    And --
24    Q    And we're going to get to that.

Page 110

1    A    Okay.
2    Q    I'm just asking about Larry at this point.
3 Is there any other entry in Exhibit 5A --
4    A    I --
5    Q    -- that talks about a complaint to Larry?
6    A    I had spoke to Larry before I spoke to Tom
7 about Tiffany's behavior towards us. So, actually,
8 that was my second time speaking to him.
9        (Exit Mr. John Ybarra.)
10 BY MS. GAUR:
11    Q    And, again, I understand there may be other
12 complaints to Larry.
13    A    Mm-hmm.
14    Q    What I'm asking about is what is documented
15 in Exhibit 5A.
16    A    Okay.
17    Q    Do you have anything documented in
18 Exhibit 5A regarding a conversation or complaint to
19 Larry besides what we've just talked about regarding
20 what happened on August 5th?
21    A    Correct -- no, no.
22    MR. WALDRON: She's just asking about
23 what's in the document.
24    THE WITNESS: Right. I -- I told her no.

Page 111

1 BY MS. GAUR:
2    Q    Okay.
3    MR. WALDRON: All right.
4 BY MS. GAUR:
5    Q    And I know you meant -- and let me --
6 before I get there. "Larry" is Larry Granger,
7 correct?
8    A    Correct.
9    Q    And what was Mr. Granger's position?
10    A    I believe he was store man -- not store
11 manager -- Dean. I'm -- I'm not for sure. He was
12 Tiffany's boss is all I know.
13    Q    Okay. Was he the district manager?
14    A    I believe he was.
15    Q    Going back to your March -- I'm sorry.
16 Going back to your May 27th, 2005, entry, which is
17 the first entry in Exhibit 5A, you talk about
18 reporting to Tom that Tiffany doesn't know how to
19 treat her employees.
20    MR. WALDRON: Back on the first page.
21 BY MS. GAUR:
22    Q    Are you -- do you see where I am?
23    MR. WALDRON: Just go back to the first
24 page of this. You're on Exhibit 5A.

Page 112

1    MS. GAUR: On Exhibit 5A.
2    MR. WALDRON: Let's just turn to that page
3 that says -- make sure we've got the --
4 BY MS. GAUR:
5    Q    And I'm looking at the first entry.
6    A    Mm-hmm.
7    Q    Got it?
8    A    Got it.
9    Q    And you talk about how you reported to Tom
10 that Tiffany doesn't know how to treat her employee?
11    A    Correct.
12    Q    Right? And is that Tom Hemmens?
13    A    Correct.
14    Q    And that's -- that's the complaint you were
15 referring to just a few minutes ago when you said you
16 made a complaint to Tom?
17    A    Correct.
18    Q    Apart from this May 27th entry, there's no
19 other complaint to Tom that's documented in your
20 notes -- right? -- your Exhibit -- notes that we're
21 looking at as Exhibit 5A.
22    A    Correct.
23    Q    And am I correct that you provided both
24 sets of notes, Exhibit 5A and 5B, to Ms. Milazzo

Page 113

1 during the course of the EEOC's investigation of your
2 claim?
3     A    Incorrect.  There was three sets of notes.
4     Q    Right.  But included within those three
5 sets of notes was also 5A and 5B, both --
6     A    Correct.
7     Q    -- both sets, right?
8     A    Correct.
9     Q    How did you send these notes to EEOC, or to
10 Ms. Milazzo, to be specific?
11     A    I'm not sure if I walked them in to her or
12 mailed them.  I can't remember how they got to her.
13 I don't know if I mailed them or -- I mailed them.  I
14 mailed them.
15     Q    Okay.
16     A    Or faxed them, one of the two.
17     Q    And the only incident as documented in your
18 notes that we've been looking at, Exhibit 5A,
19 regarding color discrimination is the note that you
20 made on July 4th, right?
21     A    Correct.
22         (Cotton Exhibit 6 marked.)
23         MS. GAUR:  And that would be Exhibit 6.
24 BY MS. GAUR:

Page 114

1     Q    Ms. Cotton, we've just handed you what has
2 been marked as Exhibit 6 to your deposition.  Again,
3 these are -- this is a copy of some notes that we
4 received from EEOC.  And it's Bates-labeled E'0092
5 through '93.  Please take a look at the notes and let
6 me know when you've finished.
7     A    I'm ready.
8     Q    Are these your handwritten notes?
9     A    Yes, ma'am.
10     Q    And who did -- who did you prepare these
11 notes for?
12     A    Well, this was actually a piece of paper I
13 had wrote my schedule on.  And -- ask me the question
14 again.  I'm sorry.
15     Q    Sure.  Did you prepare these notes for
16 somebody?  Was this something that you prepared for
17 Ms. Milazzo, or were these just notes --
18     A    These were --
19     Q    -- as part of your journal?
20     A    -- part of my journal.
21     Q    Okay.  At the very top of Exhibit 6, it
22 states, "This is m schedule."  I think it's supposed
23 to be "my schedule."  Is that right?  "This is my
24 schedule" --

Page 115

1     A    Mm-hmm.
2     Q    -- "when Tiffany talked about my skin
3 complexion."
4     A    Correct.
5     Q    Right?
6     A    Mm-hmm.
7     Q    When did you make that notation?
8     A    The day it happened.
9     Q    Okay.  I may just be misunderstanding.  You
10 made the notation, "This is my schedule when Tiffany
11 talked about my skin complexion" --
12     A    Correct.
13     Q    -- on -- on which day?
14     A    July the 4th --
15     Q    Okay.
16     A    -- as you see on the side in quotations.  I
17 took the schedule for that week because I didn't have
18 no available paper.  So I had used the schedule --
19 the paper that I had wrote my schedule on because I
20 used to keep it in my purse --
21     Q    Okay.
22     A    -- with me.  So I took the paper that I
23 wrote my schedule on and wrote it on that because I
24 didn't have a piece of paper handy at the time.

Page 116

1     Q    And why were you writing your complete
2 schedule on those days?
3     A    Because she told us we had to come in and
4 write our schedules down, Tiffany Bates.
5     Q    Oh, I see.  I see.  So you were writing
6 your schedule down so you knew what days you had to
7 come in to work?
8     A    Correct.
9     Q    But then you also then made the notation
10 that on July 4th, which was one of the days on your
11 schedule, that's when Tiffany made the comment that
12 we talked about before?
13     A    Ask me the question again --
14     Q    Sure.
15     A    -- so I don't --
16     Q    I just want to make sure I understand.
17 Okay.  So let's forget -- forget about that notation
18 at the top of your -- at the top of Exhibit 6.  Okay?
19     A    Mm-hmm.
20     Q    That Exhibit 6 is your listing of the days
21 when you had to come in to work --
22     A    Correct.
23     Q    -- right?
24         Now let's look at Exhibit 6.  And there's a

Page 121

1   A   Correct.
2   Q   Who did you give Exhibit 6 to?
3   A   EEOC.
4   Q   Okay. So this was part of the materials
5 that you gave to Carol Milazzo?
6   A   Yes, correct.
7   Q   When did you give it to Ms. Milazzo?
8   A   On or about when the beginning of the case
9 began.
10   Q   And when you say the beginning of the case,
11 you're talking about your EEOC charge?
12   A   Yes.
13   Q   Did you have a discussion with Ms. Milazzo
14 about this particular document, Exhibit 6?
15   A   Yes.
16   Q   What did you discuss with her?
17   A   I was just telling her that -- because she
18 wanted to know what was this because the paper was
19 all messed up and straggly. And I was telling her
20 that was just a schedule that I had brought with me,
21 you know, to make sure that they knew and I knew that
22 that was the day I worked. So I carried a weekly
23 schedule with me. And on the schedule, I had wrote
24 on the side in quotations what had happened that day.

Page 122

1   Q   Okay.
2       MS. GAUR: Can you mark this for me,
3 please?
4           (Cotton Exhibit 7 marked.)
5 BY MS. GAUR:
6   Q   Ms. Cotton, you've just been handed what
7 we've marked as Exhibit 7 to your deposition. Again,
8 I would ask that you please take a look at the
9 exhibit and let me know when you've finished.
10   A   Okay.
11   Q   Have you completed your review of
12 Exhibit 7?
13   A   Yes.
14   Q   And if I could ask you to turn to the
15 second page of Exhibit 7, the very bottom, where it
16 says Associate Signature, Kizzie C. Cotton. Right?
17   A   Yes.
18   Q   Is that your signature?
19   A   Yes.
20   Q   And you signed and received Exhibit 7 on
21 April 15th, 2005?
22   A   Correct.
23   Q   And for the record, Exhibit 7 is entitled
24 Major Company Policies, correct?

Page 123

1   A   Correct.
2   Q   And upon signing Exhibit 7, did you
3 understand that you were acknowledging that you had
4 reviewed and understand Family Dollar's Statement of
5 Major Company Policies and have, additionally,
6 received a copy of the Family Dollar Associate
7 Handbook?
8   A   Correct.
9   Q   We looked at the handbook a little bit
10 earlier today in your deposition, right?
11   A   Correct.
12   Q   If you could look at the first page of
13 Exhibit 7, under Fair Employment Practices. Do you
14 see that?
15   A   Okay. Yes.
16   Q   And did you understand by reading that
17 section that Family Dollar did not tolerate
18 discrimination, including discrimination based on
19 color?
20   A   Correct.
21   Q   And that there would also be no retaliation
22 against individuals who made complaints?
23   A   Correct.
24   Q   If I could ask you to turn to the second

Page 124

1 page of Exhibit 7. There's a section entitled
2 Reporting Misconduct. It's Section III near the
3 bottom.
4   A   Okay.
5   Q   Do you see that?
6   A   Yes.
7   Q   And did you understand upon reading it that
8 any misconduct that you felt was going on during your
9 employment at Family Dollar could be reported to the
10 Alert Line --
11   A   Correct.
12   Q   -- at the number -- I'm sorry. Did you
13 understand that?
14   A   Correct, yes.
15   Q   Okay. And the Alert Line number is also
16 provided in Exhibit 7, correct?
17   A   Yes.
18   Q   Now, you testified earlier that your claim
19 in this case is that Tiffany Bates harassed or
20 discriminated against you because of your color,
21 right?
22   A   Correct.
23   Q   And we mentioned one incident where she
24 harassed you because of your color, and that was an

Page 145

1 handbook states how you're supposed to talk to us.
2  Q  Explain to me how you -- strike that.
3     Explain to me what you told Tom in May of
4 2005 about what Tiffany said to you regarding your
5 skin complexion.
6  A  I just told you what I said. I told her
7 exactly that I told Tom that Tiffany had a meeting in
8 front of the store due to the store being open. It
9 was unprofessional. She started cursing at us,
10 telling us what we should do and who we should chase
11 and who we should do this and that to, meaning chase
12 the crackheads, beat them up, and do this and that.
13     And she didn't like that I had interrupted
14 because due to her cursing at us. So she reflected
15 on that because I had embarrassed her in front of her
16 coworkers, in front of my coworkers. You know, we're
17 up under her, so she was embarrassed by it. So then
18 that's when she started lashing out: "How dare you,
19 with your black ass, do this and do that in front of,
20 you know, the rest of them." She was embarrassed by
21 it.
22     So she just kept on insisting, you know,
23 that she made me feel bad, you know. So she kept on
24 nagging at my skin complexion, "your charcoal ass"

Page 146

1 and this and that. So I walked off and called Tom
2 and explained the same thing to him, what had just
3 happened.
4  Q  What did Tom say in response?
5  A  Oh, Tom, it was funny to Tom in the
6 beginning. It was very funny to Tom. And he said,
7 "Oh, no. Not Tiffany. Ms. Bates didn't do that."
8 And I -- I was hollering at the top of my lungs:
9 "What you mean, not Ms. Bates?" And he said, "Well,
10 I'll come there." And when he said he'll come there,
11 he said, "I will be there tomorrow."
12     Tomorrow took a week and a half for him to
13 come to handle the situation. So I kept calling him,
14 like, "I thought you said you was coming in, you
15 know, to handle this situation. And, you know, where
16 are you at?"
17  Q  How many times did you call Tom?
18  A  I called Tom like four or five times.
19  Q  Do you have any notes or documents to
20 support that?
21  A  Yes, I do.
22  Q  And where are those notes?
23  A  At home.
24  Q  Have you produced them --

Page 147

1  A  And -- and --
2  Q  -- to EEOC?
3  A  No, I didn't. No.
4  Q  You have notes at home that you haven't
5 provided to your counsel?
6  A  Only that, stating that -- and that -- and
7 they know that, about me calling Tom Hemmens.
8  Q  Okay. I don't care what they know. What
9 I'm asking you about right now: Do you have notes in
10 your house that you have not produced to your
11 counsel?
12  A  No, I do not.
13  Q  You just said you did.
14  A  And I just said I do not.
15  Q  Well, what's the truth? Do you or do you
16 not?
17  A  The truth -- I just told you the truth.
18  Q  Well, which time? Because you told me two
19 different things.
20  A  I just told you --
21  Q  I can read it back to you.
22  A  Okay. You can read it back to me.
23  Q  Okay. I said, "You have notes at home that
24 you haven't provided to your counsel?" You said,

Page 148

1 "Only that, stating that -- and they know that, about
2 me calling Tom Hemmens."
3  A  Well --
4  Q  Then I asked you again. "I don't care what
5 they know. What I'm asking you about right now: Do
6 you have notes in your house" --
7  A  It's --
8  Q  -- "that you have not provided to your
9 counsel?" You said, "No, I do not."
10     So I'm asking you: What is the truth? Do
11 you --
12  A  It's a lot of notes --
13  Q  -- or do you not have notes at home?
14  A  It's --
15  Q  You need to let me finish my question.
16     Do you or do you not have notes at home
17 that you have not provided to your counsel?
18  A  No, I do not. Every note that I have, they
19 have notations of it. And if they don't, in the
20 beginning, Carol Milazzo, you know, looked over
21 things and stated that a lot of things wasn't really
22 even important. So I don't know why it's not on
23 documentation. But they have that, that I called Tom
24 Hemmens. And I asked them did they need phone

149

1 records also so that they can track the number to
2 here, the conversation, if they would like.
3    Q   Do you have phone records of that? Because
4 I would like those.
5    A   I mean numbers. Numbers. Numbers --
6    Q   Okay.
7    A   -- where I used to stay at.
8    Q   Do you have notes that indicate that you
9 talked to Tom Hemmens five times with respect to this
10 particular complaint?
11    A   No, I know what I did in my head. I know
12 what I did. I know I called him five times.
13    Q   Okay. I'm not asking what you know. I'm
14 just asking you if you have notes that support that.
15 You took -- you had several journals; you were taking
16 notes. I'm asking you: Did you ever write in any of
17 those journals or any of those notes that you called
18 Tom Hemmens five times to talk about this issue?
19    A   No. There was no need to because I knew
20 what I had done --
21    Q   Well --
22    A   -- in my mind.
23    Q   -- didn't you know what you had done with
24 respect to the other incidents you documented?

150

1    A   Yes, I did, but I needed those in case --
2    Q   So why did you doc --
3    A   I documented those in case something
4 happened to me. These people not only threatened my
5 life, they called my home and said what they would
6 do. And one of the -- one of the workers did get
7 jumped on and did get beat up because they thought it
8 was me.
9        So I have no reason to sit and change
10 anything or to lie about anything. I'm not hiding
11 anything. I'm just saying I can give you the
12 numbers. I can go over phone records because, like I
13 stated, I lived in a lot of apartments due to me
14 thinking that, okay. They know where I live. And
15 she's going to follow through on what she say she's
16 going to do, you know, far as jumping on me or
17 whatever.
18    Q   If you have phone records that document
19 that you called Tom Hemmens five times, I need to see
20 those records.
21    A   Okay. I can --
22    Q   And you need to produce them to your
23 counsel because I can tell you in all of the written
24 documentation you've provided --

151

1    A   I can get them.
2    Q   -- in all of the written documentation EEOC
3 has provided, there is not one indication that you
4 called Tom Hemmens about this issue. The only
5 documentation of a call to Tom Hemmens is this one
6 that we're looking at on May 27, 2005 --
7    A   I can get them.
8    Q   -- that says nothing about color
9 discrimination.
10    A   I can -- I can -- I can get notes where --
11 no, I can ask my sister-in-law to go over some of her
12 paperwork to see what was exactly her address -- I
13 mean, what exactly was the number where I had called
14 Tom. And she can do that, and I can give it to my
15 counselor.
16    Q   Great, great, because we would -- we need
17 to see that.
18    A   Okay.
19    Q   Looking back at Exhibit 5A, which talks
20 about your only report to Tom that we have
21 documentation of, it says that he came to the store
22 on the 29th, which is two days after you noted the
23 call.
24    A   Mm-mmm. Like I told you earlier, that when

152

1 I did this, when I wrote down this one specifically,
2 I was at home. And I didn't do it exactly the day
3 that it happened.
4        But it took him a week. And I know that
5 because due to me calling him -- he was going on
6 vacation. And he said, "I thought that it was
7 necessary that I stop in just because I'm going out
8 of town," after it had lingered on so many days. A
9 week had done came.
10    Q   And this issue that we're talking about in
11 Exhibit 5A on the May 27th entry is the same -- it's
12 the same issue -- right? -- where Tiffany used
13 profanity at a meeting and that's --
14    A   Correct.
15    Q   -- what you reported to Tom? So this is
16 the same issue where during that same meeting, she
17 also commented on your skin complexion, right?
18    A   Correct.
19    Q   But nothing is documented in your May 27th
20 entry about her talking about skin complexion; the
21 only thing that's documented is that she used verbal
22 words and profanity, right?
23    A   Correct.
24    Q   Okay. You said that she called you

161

1    Q    Did anyone witness her calling you these
2 things 45 to 50 times?
3    A    Customers. Ruby Patterson. Coworkers.
4 And that's it.
5    Q    Which coworkers witnessed it?
6    A    Deanté, Anthony, and Marvin Wade.
7    Q    And if Deanté -- who is Deanté McNeail --
8 Anthony -- who is Anthony Boyd -- and Marvin Wade all
9 were to testify today that they never witnessed
10 anything improper between you and Ms. Bates, would
11 they all be lying?
12    A    That would be their opinion, yes. But they
13 would be lying if they said that they never witnessed
14 it, yes.
15    Q    They would be lying if they said they never
16 witnessed it. The three of them would be lying.
17    A    Correct.
18    Q    And what motivation would they have to lie
19 about something you're saying?
20    A    You'd have to ask them.
21    Q    Well, I'm asking you --
22    A    I -- I --
23    Q    -- because you're the one --
24    A    I don't know.

162

1    Q    -- accusing them of lying.
2    A    Yes. You said if they said they never
3 witnessed it, I said -- and you said if they said
4 they never witnessed that, and you said what would I
5 say. I was saying that they would be lying if they
6 said they never witnessed it because every time she
7 called me out my name, they either took part or they
8 laughed or they teased and they added in, or they
9 just sat back and just observed.
10         And even if they was on the sideline just
11 being the hoaxters and just laughing at what she was
12 doing, they witnessed it all the time. Sometimes
13 they would comment with her.
14    Q    Okay. Well, your counsel is aware that all
15 of them have said that they never witnessed it and
16 that she always treated you appropriately. So that
17 is their testimony.
18    A    Okay.
19    Q    And your -- your testimony in response is
20 that they're lying?
21    A    Correct, correct.
22    Q    Okay.
23    A    Correct.
24    Q    Let's talk about the incident that happened

163

1 on July 4th. Your notes document it one way.
2    A    (Nodding head.)
3    Q    Correct? And we've talked about it as it's
4 documented in your notes.
5    A    (Nodding head.)
6    Q    Do you have anything to change from how
7 it's documented in your notes?
8    A    I can tell you how that day unwrapped.
9    Q    Well, I don't want to know that. I want to
10 know the comment that Tiffany Bates said to you. Is
11 it any different than what you've documented in your
12 notes that we've looked at in Exhibit 5A?
13    A    I'm going to look over it.
14         Yes.
15    Q    Oh, so your notes --
16    A    It's changed.
17    Q    -- your notes are wrong?
18    A    Not absolutely wrong, but I -- I left out a
19 lot of stuff that took place that day.
20    Q    Okay. Putting aside the background stuff
21 that took place that day, I want to know if the
22 comment that she made to you on July 4th where she
23 said, "I don't like dark-skinned people like you
24 because you looked burnt and all black people, you

164

1 have black gums," is that accurate?
2    A    That's accurate. But she also called me
3 "black as charcoal."
4    Q    When?
5    A    And that's not on there.
6         July 4th.
7    Q    Was that in the same conversation?
8    A    Yes.
9    Q    And you didn't document that, did you?
10    A    No.
11    Q    Why not?
12    A    It wasn't enough room, as you can see, on
13 that schedule. It was a little piece of paper.
14    Q    I'm not talking about the schedule; I'm
15 talking about your journal.
16    A    Yes.
17    Q    Exhibit 5A. Do you have Exhibit 5A in
18 front of you?
19    A    Yes. Yes, I do.
20    Q    Okay. Why did you not document on
21 Exhibit 5A when you were talking about what happened
22 on July 4th that she said "black as charcoal"?
23    A    Because these was just notes that I was
24 just giving Carol Milazzo and --

Page 273

1 Q Do you know if Ms. Bates is still employed
2 by Family Dollar?
3 A I don't know anything about her.
4 Q Do you keep in touch with anyone that you
5 worked with while you were at Family Dollar?
6 A No, ma'am.
7 Q Have you talked to anyone about being a
8 witness for you in this lawsuit?
9 A No, ma'am.
10 Q Have you talked to Camille Keller?
11 A No, ma'am.
12 Q When was the last time you spoke to
13 Ms. Keller?
14 A Like I said, I had seen her one time, but I
15 think in the summer on the bus. And she was going
16 and I was going to work or whatever. And she was
17 getting off. The bus was crowded. And she was just
18 waving. And I didn't know who she was until she got
19 off the bus because she had changed so much. She had
20 cut off her hair and -- and she just changed.
21   And it was like a hit and miss. She was
22 going as I was coming.
23 Q Okay.
24 A But far as keeping in contact with none --

Page 274

1 with any of my coworkers, I choose not to because
2 it's just like if you keep a contact, you're living
3 the same thing over and over again.
4 Q Have you had any contact with the EEOC
5 investigator, Ms. Milazzo, with respect to your
6 lawsuit?
7 A No.
8 Q When is the last time you spoke to
9 Ms. Milazzo?
10 A Before Mr. Waldron got my case.
11 Q Okay. I'd like to ask you to go back to
12 Exhibit 9. We talked about the first part of this
13 letter, which was E'0084. And it goes through
14 E00087.
15   MR. WALDRON: Let's see. Is it the one
16 that's got "corporate" at the top? Yeah, okay.
17 She's got it in front of her right now.
18 BY MS. GAUR:
19 Q Okay. If I could ask you to turn to the
20 middle of the document, which is numbered E00088.
21 And the first words on the page are "Ruby, a
22 customer."
23 A Yes.
24 Q When did you take these notes?

Page 275

1 A After -- after this incident at -- no. I
2 had took these notes like when I was writing
3 everything, you know, just comparing everything.
4 Q Was --
5 A I had wrote -- I had actually wrote this
6 when this had happened.
7 Q When what had happened?
8 A When this incident had happened with my
9 check.
10 Q Okay. So there was an incident where
11 Ms. Bates gave a customer named Ruby your check -- or
12 put your check, rather, in her bags?
13 A Yes.
14 Q And you wrote this note, which begins on
15 E00088, right after that incident?
16 A Yes.
17 Q And was this something that you provided to
18 the Alert Line, or was this something that you
19 provided to EEOC, or is it both?
20 A Both.
21 Q Okay. In the left-hand margin, it says,
22 "This is Family Dollar's rules." That's something
23 that you wrote so that whoever was reading it would
24 know what you were talking about?

Page 276

1 A Yes, mm-hmm.
2 Q And this talks about how after you told on
3 Tiffany, she had coworkers do certain things to
4 you --
5 A Yes.
6 Q -- right?
7 A Yes.
8 Q Now, this doesn't say anything about color
9 discrimination by Tiffany, right?
10 A No, I was just explaining rules affecting
11 your job. And I was just writing here how she
12 affected my job far as playing hoax with mices and
13 party strings and all types of nasty stuff.
14 Q Now, did someone ask you to write about
15 rules affecting your job? Was that something that --
16 A No.
17 Q -- Ms. Milazzo asked about?
18 A No, uh-uh. What had happened was she had
19 wanted to know about the handbook. And it wouldn't
20 copy the handbook. So I had wrote this down so to --
21 you know, to let her know what Family Dollar's rules
22 was.
23 Q Okay. So you couldn't get a copy of the
24 handbook, so instead you wrote this stuff for her?